BOSTON ROAD SHOPPING CENTER, INC., Respondent, v. TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, Appellant.

First Department, April 18, 1961.

*Frederick B. Boyden* of counsel (*Joel Per* and *Arnold Guy Fraiman* with him on the brief; *Dewey, Ballantine, Bushby, Palmer & Wood,* attorneys), for appellant.

*Irving Like* of counsel (*Reilly & Like,* attorneys), for respondent.

BERGAN, J. On December 18, 1956 plaintiff and defendant entered into a written agreement to finance a shopping center which plaintiff proposed to lay out and construct at Springfield, Massachusetts. Defendant, an insurance company, agreed to lend plaintiff $1,100,000 and plaintiff agreed to accept the loan.

The contract was expressed in the form of a letter addressed by defendant to plaintiff. It stated: " we agree to make and you agree to accept from us, the loan as hereinafter described ", and recited that defendant entered into the agreement to make the loan " in consideration of " the payment by plaintiff of $22,000 which was to be repaid if the loan was actually made.

Plaintiff was unable to obtain the tenants necessary to set up the shopping center; abandoned the project; and thereupon commenced this action against defendant for the recovery of the $22,000 which it had paid " in consideration " of the defendant's undertaking. Plaintiff has had judgment for this amount by a directed verdict at Trial Term.

The directed verdict was on the court's reading of the contract between the parties as entitling plaintiff to the return of the money; and hence the court found it unnecessary to decide the somewhat larger question, also raised by plaintiff's complaint, whether, if the agreement itself clearly entitled the defendant to keep the $22,000, it would be contrary to public policy or in violation of express statutory law; and hence whether the defendant would be required to repay the money even though the contract permitted its retention.

We turn our attention first to a construction of the contract; and our reading of its terms leads us to think that the parties intended that if the plaintiff did not undertake to construct the shopping center because it could not obtain all the tenants described in a specific schedule which was annexed to the agreement, defendant was entitled to retain the $22,000 which had been paid.

In respect of the disposition of the $22,000 the agreement provides that " upon due compliance " by plaintiff with " all of the terms and conditions herein " the $22,000 will be returned

to it "upon the closing of the loan"; but if plaintiff failed to comply "with all the terms and conditions herein * * * without fault on our part, then the amount so paid as consideration for our agreements shall be retained by us in full satisfaction for our entering this agreement and holding ourselves ready and willing to make the loan within the aforesaid time, and thereupon this agreement shall become null and void."

Among other conditions undertaken by plaintiff and set forth in the agreement was to "deliver for the examination of our [defendant's] counsel, the original leases described in the attached Schedule of Leases", which leases "shall conform in all details with the said schedule" and "shall otherwise be in form satisfactory to us." The agreement also provided for the assignment of the leases to defendant.

The schedule of leases referred to in the agreement was detailed and specific. It named eight "major tenants". The term of years of each lease; the number of square feet taken; the minimum annual rental; and the percentage annual rental were specified as to each tenant. Most of the tenants were well known in the merchandising field.

An addendum to the agreement was executed January 8, 1957, in reference to the leases, which provided: "In the event any lease, or leases, as required is found to be unsatisfactory or otherwise unacceptable, with no fault on your part, so as to render this letter of commitment ineffectual we will, upon your [plaintiff's] request, cancel the commitment and refund your stand-by deposit in full." The schedule of leases attached to the original instrument was attached also to the addendum and effected changes in the space requirements of one of the lessees.

It is clear that this amendment did not relieve plaintiff of the obligation it undertook as its part of the agreement to deliver and assign to defendant the specific leases described in the schedule, with the named lessees and for the space, the duration, and the terms stated.

This was not a mere promise by plaintiff that it would look around to find tenants that would be satisfactory to defendant. Defendant was not a partner of plaintiff in a hopeful or speculative venture in which an attempt would be made to bring in tenants. On the contrary, plaintiff agreed to a very precise and specific undertaking; and nothing in the addendum to the agreement changed the nature of its obligation.

It is argued by plaintiff that the right of the defendant to reject a "lease or leases" as "unsatisfactory or otherwise unacceptable", made the undertaking by defendant illusory and hence the contract lacked mutuality; that all plaintiff had to do

was offer a lease which it knew defendant would regard as unsatisfactory or unacceptable, and that plaintiff would thus be entitled to the return of the money paid.

It seems reasonable to think, however, that the parties were dealing in the addendum with the same kind of satisfaction to the defendant they had treated in the original instrument, i.e., the form of the leases. The original instrument stated that " leases " shall conform " in all details with the said schedule " and shall otherwise " be in form satisfactory to us ", and the amendment provided for the contingency that any " lease or leases, as required " be found " unsatisfactory or otherwise unacceptable."

The theory on which the court at Trial Term directed a verdict for plaintiff was that if plaintiff acted in good faith, tried to get tenants but could not get them, it was entitled to repayment of the $22,000. The court said:

" The fact is that the plaintiff did act in good faith, did want the project to go forward, did try to get the leases, was unable to do so. Everybody agrees that the inability to procure the leases was at the bottom of the very transaction, that there could not be a mortgage unless there were these leases. Plaintiff being unable to get the leases, it told that to the defendant and asked for the return of the money.

" I think it is entitled to the return of the money, and that being so, I am going to direct a verdict for the plaintiff for the full amount."

But the defendant was not building a shopping center; it was providing money as a commodity. As an insurance company it agreed to lend $1,100,000 upon the plaintiff's undertaking to produce specific tenants on specific terms; and procuring those tenants was the unperformed contractual undertaking, not of the defendant, but of the plaintiff.

The requirement that defendant must be satisfied with the " leases " did not render the agreement illusory. It seems reasonable to believe that if defendant had rejected the leases as unsatisfactory, it would have been required to do so on reasonable grounds resting on the form of the leases themselves, since it had accepted the tenants and the terms stated in the schedule. But even if the test of defendant's rejection of the leases be good faith, rather than reasonableness, the contract is enforcible according to its terms and is not illusory. (*Mattei* v. *Hopper*, 51 Cal. 2d 119; *Fursmidt* v. *Hotel Abbey Holding Corp.*, 10 A D 2d 447, reargument denied 11 A D 2d 649; 1 Corbin, Contracts, § 150, vol. 3A [rev. ed., 1960], § 644; 3 Williston, Contracts [rev. ed., 1936], § 675A, p. 1943; cf. *Wynkoop Hallen-*

*beck Crawford Co.* v. *Western Union Tel. Co.,* 268 N. Y. 108.)

Having reached this conclusion we uncover the problem whether the agreement that the $22,000 could be retained by defendant if plaintiff " failed to comply " with " all the terms and conditions herein " is invalid as contrary to public policy or is interdicted by specific statute law. Plaintiff's complaint characterizes the payment as a " standby deposit ", and it is argued here that damages are not recoverable by a lender for a breach of contract to make a loan; that no actual damages were pleaded or shown by defendant; that the agreement was usurious even though plaintiff is a corporation; and that the retention of the $22,000 is *ultra vires* income of defendant under the Insurance Law.

Whether a consideration which may become a measure of liquidated damage may lawfully be paid to a lender of money for making a loan agreement, where substantial sums of money must be assembled and made continuously available over a future period, is a question of growing importance; since the financing of large projects frequently follows the pattern disclosed by this record.

Although it has been held where a lender has breached an agreement to provide money the borrower must show specific damage which, in the absence of special circumstances, would ordinarily be the increased interest he would pay to another lender (*Avalon Constr. Corp.* v. *Kirch Holding Co.,* 256 N. Y. 137) that decision does not disapprove a provision in such an agreement for liquidated damages; and this is not a case in which defendant is suing plaintiff for damages, but in which defendant accepts and claims the right to hold the amount agreed upon if the plaintiff failed to perform. Indeed, *Avalon* would sustain in principle the right of a party damaged by a breach of an agreement to lend money to recover appropriate damage.

Plaintiff cites as a general proposition the statement in volume 15 of American Jurisprudence, page 693 (Damages, § 259) that the rule permitting the parties to a contract to liquidate the damages is circumscribed in agreements for the loan of money, which are under the control of a court of equity to prevent an " unreasonable stipulation " in the shape of agreed liquidation of damages.

But there is nothing in the record to suggest that the payment of $22,000 by plaintiff was unreasonable or oppressive. Defendant was required to hold $1,100,000 in readiness over a 15-month period, and $22,000 would amount to about 1½% on this sum for that period. It would have been proper to charge interest

for the money being held for plaintiff's use (*Bevier* v. *Covell*, 87 N. Y. 50).

The right of a lender to collect a " standby fee " on a large loan under circumstances quite similar to the case before us was upheld in *Chambers & Co.* v. *Equitable Life Assur. Soc. of U. S.* (224 F. 2d 338 [C. C. A. 5th, 1955]) ; and similarly " standby interest " was sustained by the St. Louis Court of Appeals in *Continental Assur. Co.* v. *Van Cleve Bldg. & Constr. Co.* (260 S. W. 2d 319 [Mo.]) as a valid agreement for liquidated damage.

Nothing in the public policy of New York requires the court to strike down this payment in the nature of liquidated damages for a breach of contract by plaintiff. It is entirely reasonable in relation to the nature and extent of defendant's undertaking and arrangement; no oppression or overreaching which might suggest the need for equitable intervention is demonstrated. The additional points that the payment was usurious as to the corporate plaintiff and beyond the power of the defendant as an insurance company are without substance.

The judgment should be reversed on the law and the facts; the complaint dismissed; and judgment entered for defendant, with costs.

BOTEIN, P. J., BREITEL, RABIN and EAGER, JJ., concur.

Judgment unanimously reversed, on the law and on the facts, the complaint dismissed, and judgment directed to be entered for defendant, with costs. Settle order on notice.