**WEIGHT WATCHERS OF QUEBEC LTD. and Weight Watchers of Manitoba Ltd., Plaintiffs,**

v.

**WEIGHT WATCHERS INTERNATIONAL, INC., Defendant.**

**No. 73 C 1121.**

United States District Court,
E. D. New York.

March 27, 1975.

Hammond & Schreiber, P. C., New York City, for plaintiffs; by Dale A. Schreiber, New York City.

Davis, Gilbert, Levine & Schwartz, New York City, for defendant; by Patricia Hatry, New York City.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

This is a diversity action brought by two Canadian franchisees, Weight Watchers of Quebec Ltd. ("WW Quebec") and Weight Watchers of Manitoba Ltd. ("WW Manitoba"), alleging breach of a franchise agreement by defendant-franchisor, Weight Watchers International, Inc. ("WWI"). WWI has moved for summary judgment dismissing the entire action; plaintiffs have cross-moved to amend the complaint.

As originally filed, the complaint alleged three causes of action, only the first of which is now before the court.[1]

---

1. The second and third claims for relief are contingent in nature, and plaintiffs' cross-

motion seeks, in addition to amendment of the first claim, to dismiss those claims with-

That claim seeks damages and declaratory relief for what plaintiffs assert to be a breach of WWI's obligation under the respective franchise agreements to respect the territorial exclusivity of the franchises and to enjoin by legal proceedings any infringement of the Weight Watchers trademarks by others.

## I.

Defendant WWI is a New York corporation with its principal place of business in Great Neck, New York. WWI has registered trademarks and trade names in the United States, Canada and elsewhere, in connection with its business of developing and licensing techniques and methods for group participation in achieving body weight control. Among its trademarks or trade names is that of "Weight Watchers."

Plaintiffs WW Quebec and WW Manitoba are Canadian corporations formed and wholly owned by Marilyn and Sheldon Reich as two of the 103 franchisees licensed by WWI to operate weight control classes under the trademarked name "Weight Watchers." WW Quebec, WWI's exclusive franchisee in the Canadian province of Quebec since 1967, is presently governed by a franchise agreement dated June 17, 1972. WW Manitoba, the exclusive franchisee in Manitoba, is governed by its original agreement of July 23, 1969. Since moving to Canada from Brooklyn, New York, in 1967, the Reichs have apparently built their operations into a business they estimate to be worth several million dollars, whereas their franchise license fees initially were $7,625 plus a continuing fee to WWI of 10% of gross receipts.

Despite the overall success of their venture, plaintiffs complain at length about injury to their business caused by WWI's alleged failure to prosecute in good faith certain trademark infringe-

ment actions against a former franchisee, Weight Watchers of Ontario Ltd. ("WW Ontario"), and its associates. WW Ontario, operated by Dr. and Mrs. Daniels ("the Daniels"), had been defendant's exclusive Ontario franchisee since June 30, 1967. WWI terminated the Daniels' franchise agreement on April 30, 1971, alleging WW Ontario's breach by subfranchising part of its territory and other acts unrelated to unauthorized territorial expansion.

Litigation ensued. In June 1971, WWI brought suit in the Ontario provincial court against WW Ontario on the termination and sued again in November 1971 in Canadian federal court for trademark infringement. In defense and counterclaim, WW Ontario sought, *inter alia*, expungement of WWI's Canadian trademark registration as invalid. A third action for trademark infringement and unfair competition was filed by WWI in September 1972 against WW Ontario also in Canadian federal court. This last action sought an injunction restraining WW Ontario, its associated companies, and the Daniels from using the Weight Watchers trademark throughout Canada. This was met in October 1972 by a suit by WW Ontario against WWI in Canadian federal court seeking to enjoin WWI and its new Ontario franchisee from operating in Ontario.

During the pendency of the lawsuits the Daniels mounted a broad and skillful campaign to reduce the trademark "Weight Watchers" to a generic term, and, beginning in January 1973, expanded their operations from Ontario into Manitoba. Faced with what it believed to be an abridgment of its exclusive territorial rights, WW Manitoba, unable to institute legal action until WWI had failed to do so for a statutory waiting period of two months,[2] notified WWI of

out prejudice. The contingency was that WWI's Canadian trademark be declared invalid in actions pending in Canada at the time the complaint was filed, July 27, 1973. Since, as will be seen, that contingency no longer exists, the court agrees that the

claims are moot and should be dismissed (Pl. Memo. of Law, pp. 3, 8).

2. Canadian Trade Marks Act, § 49(4), provides as follows:
   "Subject to any agreement subsisting between the parties, a registered user of a

the situation during January 1973.[3] On March 19, 1973, WWI responded, promising an investigation of the Daniels' operations in Manitoba within 30 days.[4] On March 23, 1973, WWI filed a motion in one of the federal actions for an interlocutory injunction restraining continued territorial and trademark infringement by the Daniels. This motion was the first of its type to be prosecuted by WWI in any of the actions. Interlocutory relief was never granted, however, as WWI consented to an order staying the motion, setting a discovery schedule, and fixing September 25, 1973 as the consolidated trial date for all the federal actions.[5]

On April 25, 1973 the Daniels established a foothold in the far western part of Quebec with the start of weight control classes under the name "Weight Watchers." This did not go unnoticed by WW Quebec, which notified WWI on May 4, 1973, via plaintiffs' Canadian counsel.[6] WWI declined to institute a new suit, contending it was unnecessary as the infringing activity and relief requested were within the scope of the pending federal actions, and warning that a new action might delay the timetable and trial date set in the federal actions, which "seek to halt all infringement of [WWI's] Trademarks by [WW Ontario] throughout Canada, at the earliest date." [7]

After the two-month waiting period, WW Quebec filed its own suit in the Quebec provincial courts against WW Ontario seeking injunctive relief against any Quebec operations by the Daniels. WWI was joined as a *mis-en-cause* [8] and moved on August 21, 1973 to stay WW Quebec's motion for an interlocutory injunction.[9] This application was denied by the court, and shortly thereafter WW Ontario consented to an interlocutory injunction prohibiting further expansion of their Quebec operations beyond the single location already established, and prohibiting any further advertising of classes in Quebec.[10]

On September 25, 1973, the trial in the federal actions was adjourned until October 22, 1973. Reich asserts he was told by WWI's attorneys that the case would not be settled. The three federal court actions were in fact settled the next day, however, all actions being dismissed except the September 1972 action for trademark infringement. In that case, WW Ontario consented to a judgment requiring it to cease all infringement of WWI's "Weight Watchers" trademarks by August 1, 1974, and acknowledging their validity as between the parties.[11]

This action was brought three months before the settlement of the Canadian federal court actions. Briefly, plaintiffs claim that their franchise agreements amounted to an exclusive license of the "Weight Watchers" trademark for weight control classes in the WW Quebec and WW Manitoba territories.

---

trademark may call upon the owner thereof to take proceedings for infringement thereof, and, if the owner refuses or neglects to do so within two months after being so called upon, the registered user may institute proceedings for infringement in his own name as if he were the owner, making the owner a defendant; but an owner so added as defendant is not liable for any costs unless he takes part in the proceedings." Reich Aff., ¶ 25.

3. Reich Aff., Exhs. 21, 21A.

4. *Id.*, Exh. 22, Letter of Manny Mark to Sheldon Reich.

5. *Id.*, ¶¶ 26, 31 and Exh. 8.

6. *Id.*, ¶ 28 and Exh. 25.

7. *Id.*, ¶ 28 and Exh. 26, Letter of Robert William Hollweg to Philip Shugar, dated May 18, 1973.

8. Apparently a third party intervenant under Canadian law and procedure.

9. Affidavit of J. Nelson Landry, Esq. (WW Quebec's counsel in the provincial action).

10. Except for one final Daniels' periodical advertisement. Reich Aff., Exh. 28. The undertaking by the parties was terminable upon the disposition of the action or a final judgment in WW Ontario's favor in the federal court actions, whichever was first. *Id.*

11. *Id.*, Exh. 29.

A breach of that exclusivity arose, they contend, because of: (1) defendant's deliberate refusal to exercise its contractual controls over WW Ontario; (2) defendant's failure to diligently pursue injunctive relief against WW Ontario; and (3) defendant's consent to an order allowing WW Ontario to use the "Weight Watchers" trademark in plaintiffs' territories from October 23, 1973 until August 1, 1974.

Defendant sought discontinuance of the action once the settlement was consummated in Canada, but plaintiffs declined, pressing their claims of WWI's alleged bad faith in delaying the Canadian actions, Compl. ¶ 11, and its failure to take measures to protect plaintiffs' exclusive territory rights under their contracts. *Id.*, ¶¶ 12–14.[12] Defendant's summary judgment motion followed, supported by an affidavit characterizing plaintiffs' claim as "patently untenable" or "incredible."[13] Among other things, WWI points to legal expenditures of about $500,000 in its battle with the Daniels, the ultimately successful settlement of the Canadian litigation, and the fact that plaintiffs' claims of territorial infringement ought to be directed against the Daniels' organizations, which are not parties in this action.

## II.

At issue in this action is the extent of defendant's obligation to plaintiffs under the franchise agreements and, more particularly, the clauses which follow.

Each franchise agreement provided that among other obligations WWI would:

> "Exercise its best efforts to protect the Trademarks by, whenever practicable, taking the necessary steps to register the Trademarks, or any of them, with the proper governmental authorities and, when it considers it advisable, will institute legal proceedings to enjoin any action which it regards as an infringement of the Trademarks."[14]

WWI also agreed not to infringe upon or authorize infringement upon the territorial exclusivity of each franchise. The WW Manitoba agreement provides:

> "So long as this agreement shall remain in effect, [WWI] will not conduct Weight Watchers Classes within the Territory and will not give anyone other than [WW Manitoba] the right to do so."[15]

The WW Quebec agreement provides similar protection.[16]

Both agreements are expressly governed by New York law.[17] Plaintiffs cite extensive and undisputed New York authority for the proposition that each party to an agreement "is bound by an 'implied covenant of good faith and fair dealing'" in its performance of the contract.[18] Plaintiffs go so far as to suggest that more than a question of discretion exercised in good faith is involved, and that WWI was required to act *reasonably* in its institution and prosecution of legal proceedings. They claim that if it is shown that the insti-

12. However, the settlement did obviate plaintiffs' claim that the Canadian actions had "not been tried and will not be ready for trial for several years." Compl. ¶ 10. See n. 1 *supra.*

13. Mark Aff., pp. 3, 4 (Feb. 21, 1974).

14. WW Manitoba-WWI Franchise Agreement of July 23, 1969, ¶ 14(a), attached as Exh. 2 to Reich Aff. (hereinafter "WW Manitoba Agreement"); WW Quebec-WWI Franchise Agreement of June 17, 1972, ¶ 12(a), attached as Exh. 1 to Reich Aff. (hereinafter "WW Quebec Agreement"). Although the latter exhibit is somewhat incomplete in this para-

graph, it appears undisputed that the obligation was the same under each.

15. WW Manitoba Agreement, ¶ 1.1.

16. WW Quebec Agreement, ¶ 1.1.

17. WW Manitoba Agreement, ¶ 24; WW Quebec Agreement, ¶ 23. The court will honor a choice-of-law rule consented to by the parties where there is a reasonable basis for the choice or the chosen state has some relation to the agreement. *Siegelman v. Cunard White Star*, 221 F.2d 189, 195 (2 Cir. 1955); 1 Restatement 2d, Conflict of Laws 2d, § 187 (A.L.I. 1971).

18. Pl. Memo. of Law, p. 15.

tution of further legal proceedings by defendant were unreasonably, even if honestly, delayed or prolonged, there has been a breach of the franchise agreements. For this proposition, plaintiffs point to *Loengard v. Metal & Thermit Corporation,* 204 F.Supp. 74 (S.D.N.Y. 1962); *Boston Road Shopping Center, Inc. v. Teachers Insurance and Annuity Association of America,* 13 A.D.2d 106, 213 N.Y.S.2d 522 (1st Dep't 1961), *aff'd* 11 N.Y.2d 831, 227 N.Y.S.2d 444, 182 N.E.2d 116 (1962); *Wynkoop Hallenbeck Crawford Company v. Western Union Telegraph Company,* 268 N.Y. 108, 196 N.E. 760 (1935).

Defendant, on the other hand, contends that the clauses in question are explicit as to the extent of obligation. Litigation against third party infringers is expressly left entirely up to the franchisor and the court should not, under the guise of "good faith", become involved in "an endless round of second guessing" by an inquiry into three years of intensive litigation of some seven cases in the courts of Canada [19]—which ended successfully not only for WWI but for all its franchisees, including plaintiffs. The force of this view is heightened by a legal opinion furnished by a Canadian barrister to plaintiffs' Canadian counsel. That opinion expresses the view that the "Weight Watcher" trademarks were improperly registered in Canada and hence subject to being held non-distinctive. The opinion advises, "We believe that your client has no choice but to wait and see what happens as between" WWI and WW Ontario.[20]

█ However vulnerable plaintiffs' claim based on litigation delay may be, it appears undeniable that the settlement concluded by WWI permitted WW Ontario to continue its infringing activities in plaintiffs' exclusive territories for a further period of some ten months until August 1, 1974. The plain import of the contracts is that only plaintiffs shall have the right to the use of defendant's trademarks for weight control classes in their respective territories. Under ¶ 1.1, defendant could not compete with plaintiffs in their territories and could not allow anyone else to compete with plaintiffs there under the "Weight Watchers" banner. Moreover, while there is no affirmative obligation in ¶ 1.1 requiring defendant to prevent an unauthorized invasion of plaintiffs' territories by a third party, if such an invasion was accompanied by the use of "Weight Watchers", it would clearly be an "infringement" of WWI's Canadian trademarks by another, as that term is used in ¶ 14(a) and ¶ 12(a) of the WW Manitoba and WW Quebec Agreements, respectively.

█ WWI's interpretation of its obligation ignores not only these express undertakings but also the realities of the situation. Since a franchise may be viewed as "a license coupled with restrictions designed to enforce either uniformity of operation or a minimum standard of service",[21] interpretation of

19. Hatry Aff., p. 5.

20. Letter of Norman R. Shapiro, Barrister & Solicitor, to Philip A. Shugar, Esq., at p. 10 (Dec. 16, 1971), attached as an exhibit to Mark Reply Aff. (April 17, 1974).

21. 1 G. Glickman, Franchising ¶ 2.03[2] (1974). In fact, under American law, a naked license without such supervisory control is invalid. *E. I. du Pont de Nemours & Co. v. Celanese Corporation of America,* 167 F.2d 484, 489, 35 CCPA 1061 (1948); *Susser v. Carvel Corporation,* 206 F.Supp. 636, 641 (S.D.N.Y.1962), *aff'd,* 332 F.2d 505 (2 Cir. 1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); *Arthur Murray v. Horst,* 110 F.Supp. 678, 679 (D. Mass.1953). The nature of the obligation of a trademark licensor to exercise supervisory control has been concisely expressed as follows:

"If the owner of a trademark wants to license the use thereof to another and still retain as his own the enjoyment of the rights stemming therefrom, he must do so in such a way that he maintains sufficient control over the nature and quality of the finished product, over the activities of the licensee, as will enable the licensor to sustain his original position of guarantor to the public that the goods now bearing the trademark are of the same nature and

bargained-for contract terms in a franchise agreement must take account of the extent to which the franchisor has, depending on its philosophy or upon the nature of the products and services franchised, sought to exercise contractual control over the operation of the franchises. See 2 R. Callmann, Unfair Competition, Trademarks and Monopolies, § 38.2(a)(1)a at 115 (3d ed. 1968). Where such controls are so great that the franchisee begins to lose his identity as an independent distributor, the agreement ordinarily ought to be viewed as something less than an extensively negotiated arms-length transaction between economic equals.

The court has not been directed to nor has it found any cases dealing with the scope of franchisor obligations in the protection of franchisees against trademark infringement by unlicensed competition. Somewhat similar situations have arisen in the patent and trademark licensing area where there has been no franchise agreement.[22]

■■ In an ordinary trademark licensing situation, there is no doubt but that the licensor may not take any affirmative action to derogate from his own grant of a license. 3 R. Callmann, *supra* n. 22, § 78.2 at 453–54, 471. See

R. Ellis, *supra* n. 22, § 209. It is also true that such a license, without more, "does not create a fiduciary relationship." 3 R. Callmann, *supra*, § 78.2 at 455, and the rights and duties of the parties "are determined by their underlying contract." *Id.* at 453. But here the franchise did involve a very high degree of franchisor control over the franchisees' operations.[23] Under the circumstances the court cannot view WWI as having made an entirely vacuous promise to its highly dependent franchisees.

There is, however, a substantial limitation on the need for defendant to account for its actions to plaintiffs. Had the franchise agreement clearly specified whether the test of WWI's conduct was to be one of good faith or one of reasonableness, the court would be bound by such an unambiguous expression of intent.[24] However, no such clear expression is involved in the present case; there is no expression of either standard. In somewhat analogous circumstances, a subjective test has often been applied to ambiguous conditions involving matters of personal taste, sensibility, judgment, or convenience; an objective test has been used in evaluating satisfaction as to mechanical fitness, utility, or marketability. See Restate-

quality as were the goods bearing the trademark before the licensing, or, that the mark now has the same meaning as far as the public is concerned as it did before the licensing." *Morse-Starrett Products Co. v. Steccone*, 86 F.Supp. 796, 805 (N.D.Cal.1949).

As part of such quality control, a trademark licensor must ensure that upon termination of a license, a licensee ceases all use of the trademark. 1 G. Glickman, *supra*, ¶ 4.-03[3] at 4–34.3 to 4–34.4. Franchise agreements routinely provide for such an eventuality. *Id.* See, *e. g.*, WW Quebec Agreement ¶ 11.6, WW Manitoba Agreement ¶ 13.6.

22. See, *e. g.*, 1 T. Costner and H. Einhorn, Patent Licensing Transactions § 2.16 (1974); 4 Deller's Walker on Patents § 406 at 625 (2d ed. 1965); R. Ellis, Patent Licenses § 223 (3d ed. A. Deller 1958); 3 R. Callmann, Unfair Competition Trademarks and Monopolies, § 78.2 at 471–72 (3d ed. 1969).

23. Included are such earmarks of close supervision of Weight Watchers classes as the promulgation of a manual of licensee rules and regulations, a lecturers' manual, a clerks' and weighers' manual, and standards for the personal weight of employees. The franchise agreements also strongly emphasize the uniqueness of WWI's methods and the special training involved in training lecturers. The manual of rules and regulations prescribes special training for employees, sets out a uniform coupon system for lifetime Weight Watchers membership, and sets forth a uniform system of bookkeeping records and reports and financial statements to WWI.

24. In *Ard Dr. Pepper Bottling Co. v. Dr. Pepper Co.*, 202 F.2d 372, 377 (5 Cir. 1953), the court held the licensor only to a good faith standard because of unambiguous language to that effect in the licensing agreement.

ment 2d, Contracts § 254 (A.L.I. tent. draft 1973); 5 S. Williston, Law of Contracts §§ 675A, 675B (3d ed. W. Jaeger 1961); 3A A. Corbin, Contracts §§ 644-46 (1960); 10 N.Y. Jr. Contracts §§ 301-02 (1960).

█ In this case, the court is satisfied that the decisions involved in reaching a conclusion about the advisability of the institution of legal proceedings in connection with trademark infringements in a foreign country are quite beyond the pale of objective standards of reasonableness. It would be as impracticable to second guess *good faith* legal judgments on complex multi-national trademark infringement issues as it would be to inquire into the reasonableness of one's dissatisfaction with the work of a portrait painter or a theatrical artist. Moreover, the preference for an objective standard grows out of cases where there would otherwise be a forfeiture—the essence of the contract being the subject of an express condition of satisfaction, such as the building of a home to the satisfaction of the buyer before payment is due, or even the termination of a trademark license when the

licensor is dissatisfied with the licensee's performance.[25] This case, of course, presents no such similar situation, the obligation in question being only peripheral to the trademark license itself. Nor do the cases cited by plaintiffs suggest any contrary conclusion.[26]

In fact, plaintiffs fail to point to a single cogent reason for the adoption of a reasonableness standard, and the court is satisfied that, under all the circumstances, good faith is the proper test. Objective inquiry into the reasonableness of the delays in the legal proceedings, the terms of the ultimate settlement, or even the failure to institute additional proceedings is entirely foreclosed. Thus, the sole question remaining is whether there are sufficient issues of material fact concerning defendant's alleged bad faith, either during the course of the Canadian litigations, or thereafter, to preclude summary judgment dismissing the breach of contract claims.

### III.

Plaintiffs' efforts to demonstrate a triable issue of fact revolve around the central proposition they advance, name-

---

25. See, *e. g.*, *Ard Dr. Pepper Bottling Co.*, *supra* n. 24.

26. Plaintiffs' citation to *Loengard, supra*, presents no contrary conclusion. In that case the court held that a determination of whether a given act is detrimental to a corporation was subject to an objective test, and found that a shareholder's good faith participation in a proxy fight could not, under such a test, be deemed detrimental. 204 F.Supp. at 77. Aside from the fact that what was involved was a termination clause that might otherwise have worked a forfeiture, a subjective standard was rejected for policy reasons and other considerations not present here. *Id.* at 77-78.

In *Wynkoop, supra*, the New York Court of Appeals rejected use of an objective standard as to amounts of "administrative and overhead charges." 268 N.Y. at 112-13, 196 N.E. 760. This holding adds, rather than detracts, from the view espoused here.

As much again could be said for the line of New York authority advanced by plaintiff dealing with the situation where an insurance company assumes the defense of an ac-

tion. In such cases a rule of strict good faith in the conduct of the defense applies, despite language which would appear to grant the insurance company complete discretion. *E. g.*, *Brockstein v. Nationwide Mutual Insurance Company*, 417 F.2d 703, 705 (2 Cir. 1969), *cert. denied*, 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 791 (1972); *New York Consolidated Railroad Company v. Massachusetts Bonding and Insurance Company*, 193 App.Div. 438, 444, 184 N.Y.S. 243, 247 (2d Dep't 1920), *aff'd*, 233 N.Y. 547, 135 N.E. 912 (1922). In none of the cases is there any suggestion that the insurance companies were circumscribed by a reasonableness standard.

Finally, in *Boston Road Shopping Center, Inc., supra*, the court was not faced with the question presented here, but held that where a commitment to finance a shopping center by an insurance company required that leases procured not be "unsatisfactory or otherwise unacceptable" to the company, the agreement was not illusory because the contract was enforceable under either a good faith or a reasonableness test. 13 A.D.2d at 109, 213 N.Y.S.2d at 526.

ly, that the interests of the parent-franchisor were not coextensive with those of the franchisees. Plaintiffs point out, for example, that there is a great disparity in size between WWI and any individual franchisee. It is also argued that since the 10% royalty is extracted by WWI from gross receipts rather than net profit, defendant had little or no concern for the profitability of the plaintiffs during the Daniels' incursion into their territory. Plaintiffs point to WW Ontario's effect on their profitability in 1973: while there was an increase in WW Manitoba's gross receipts—and hence WWI's revenue—profitability declined, largely owing to substantial increases in advertising and promotional expenses, allegedly attributable to the incursion upon its territory.[27]

■ However, even if this demonstrates, as plaintiffs contend, that speedy remedial steps to halt the Daniels' activities, although crucial to them were insignificant to defendant, it hardly establishes even a triable issue of bad faith. There can be no doubt that, in the long run, the failure to adequately protect its Canadian trademarks would leave WWI without any revenue from Canadian franchisees, if not in similar or deeper trouble elsewhere. Hence the economic disparities presented, without more, do not save plaintiffs' claim from being "patently untenable."

There appear, however, more specific allegations of asserted improper motivation on the part of WWI. It appears that in June of 1972 the Reichs approached WWI about the purchase of their franchises, apparently expressing a desire to move permanently to Florida. Meeting in Montreal, WWI offered them $2,000,000 in cash. There is some speculation over whether the motivation for the offer was the Reichs' solicitation,

economic considerations,[28] or a desire to improve in some way WWI's posture in the WW Ontario-WWI litigations. Whatever the motivation, the offer was rejected, whereupon it is alleged, although categorically denied by WWI, that its treasurer, Manny Mark, stated to Sheldon Reich, "Why should I pay $2,000,000 for your franchise when I can get it for nothing."[29]

Next the Reichs negotiated in late 1972 with Cemp Investment Company ("Cemp") for the sale of the two franchises for a minimum of $3.6 million. The deal apparently fell through, however, because Cemp requested assurances of the continuing validity of the WWI Canadian trademarks, which plaintiffs were unable to obtain from WWI. Cemp's negotiator in the transaction, Arnold Ludwick, upon request, met with Albert Lippert, chairman of the board of WWI, ostensibly to discuss the litigious relationship between WWI and its franchisees. Thereafter, Ludwick reduced the cash portion of the Cemp offer from $2.35 million to $1 million, explaining that he had found Lippert evasive and noncommital and his explanations unsatisfactory. Plaintiffs rejected this offer.[30]

The remainder of plaintiffs' evidence on bad faith deals with alleged acts of discrimination by WWI in subsidizing advertising expenses for some Canadian franchisees but not plaintiffs, and alleged unwarranted threats of reprisals of termination of WW Quebec for use of unapproved advertisements.

■ However fragile plaintiffs' claim may appear, summary judgment is not designed to weed out dubious claims, but only those with no basis in material fact. There can be no doubt that plaintiffs' claim survives such scrutiny. Plaintiffs point out, moreover, that their

27. Reich Aff., ¶¶ 34–37.

28. Plaintiffs contend there is no doubt that WWI, having bought out another Canadian franchisee, Weight Watchers of British Columbia, Limited, "had an interest in acquiring its Canadian franchisees." Reich Aff., ¶ 42.

29. Reich Aff., ¶ 39, Mark Aff., p. 4, Mark Reply Aff., pp. 1–2.

30. Reich Aff., ¶ 41.

discovery of the motivations underlying defendant's actions is by no means complete. Indeed, they assert they have never seen the terms of the stipulation of settlement between WWI and WW Ontario which affects their exclusive rights in Quebec and Manitoba. Yet at present it is obvious that factual issues surround the alleged designs defendant had on the purchase of plaintiffs' franchises at a price it may have had within its power to affect. That power came from defendant's economic and contractual position vis-a-vis each of its franchisees. If such an alleged conflict of interest did exist, a fact not now decided, the question of defendant's intent in the context of delay or failure to institute legal proceedings, which it might otherwise have been confident of winning, may well be material.

The number and weight of the "ifs" and "mights" in such a claim do not change the fact that plaintiffs have produced some evidence which brings the case within the realm of fact finding and inference drawing. District courts are continually reminded that summary judgment is particularly inappropriate where, as in this case,

> "it is sought on the basis of 'the inference which the parties seek to have drawn [as to] questions of motive, intent, and subjective feelings and reactions' . . . " [31]

The court is also obliged to permit pre-trial discovery of evidence of bad faith that might be within the exclusive control of defendant and which has not yet been made available. Rule 56(f), F.R.Civ.P.; *Grant v. Esquire, Inc.*, 367 F.Supp. 876, 879 (S.D.N.Y.

1973); 6 Moore's Federal Practice ¶ 56.24. In view of the foregoing, defendant's motion for summary judgment must at this point be denied.

## IV.

Plaintiffs' motion to amend the complaint seeks to restate in two counts the present first cause of action and to bring before the court all disputes between the parties arising under the franchise agreements. Defendant objects to the new claims, suggesting some of the matters may have already been resolved and the amendment would unduly confuse and complicate matters. Joinder of such new claims would have been proper initially under Rule 18(a), F.R.Civ.P., and may be accomplished thereafter by amendment under Rule 15(a), F.R.Civ.P., 3 Moore's Federal Practice ¶ 15.08[3]. The court is not required to approve such an amendment over the objection raised here, absent a clear showing that, in each case: (1) the amendment relates to a still-viable claim; (2) it will not unnecessarily complicate the litigation or prejudice the defendant; (3) it is offered in good faith; and (4) it is not unduly delayed. *Id.*, ¶ 15.08[4]. Those elements are not apparent in the motion papers and the motion must therefore be denied.

Accordingly, plaintiffs' and defendant's respective motions are denied except to the extent of granting the proposed amendment of the first cause of action and the dismissal of plaintiffs' original second and third causes of action as moot.

So ordered.

---

31. *Friedman v. Meyers*, 482 F.2d 435, 439 (2 Cir. 1973), quoting from *Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 71 (2 Cir. 1971).