Denise **GILLILAND, Plaintiff,**

v.

**NOVARTIS PHARMACEUTICALS CORPORATION, Defendant.**

No. 1:12–cv–00029.

United States District Court,
S.D. Iowa,
Western Division.

Signed July 28, 2014.

Cheryl P. Robertson, Girardi Keese, Los Angeles, CA, J. Barton Goplerud, Hudson Mallaney Shindler & Anderson PC, West Des Moines, IA, John A. Girardi, Girardi Keese, Los Angeles, CA, Molly B. Weber–Girardi, Girardi Keese, Los Angeles, CA, for Plaintiff.

Ross W. Johnson, Faegre Baker Daniels, LLP, Des Moines, IA, Christine R.M. Kain, Faegre Baker Daniels LLP, Minneapolis, MN, Donald W. Fowler, James M. Sullivan, John Michael Kalas, Katharine R. Latimer, Peter J. Skalaban, Jr., Hollingsworth LLP, Washington, DC, for Defendant.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is Novartis Pharmaceuticals Corporation's ("Novartis") Motion To Find That Punitive Damages Are Unavailable ("Motion"),[1] filed May 15, 2014. Clerk's No. 82. On June 17, 2014, Denise Gilliland ("Gilliland") filed a response. Clerk's No. 94. Novartis replied on July 1, 2014. Clerk's No. 103. The Motion is fully submitted.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND [3]

On June 17, 2005, Gilliland was diagnosed with multiple myeloma. As a part of her treatment regimen, she received Zometa infusions from July 1, 2005 until May 1, 2009 when she independently decided to discontinue her Zometa treatment. She was not seen by a dentist prior to receiving her first dose of Zometa. On February 7, 2006, Gilliland underwent a stem cell transplant. On the advice of the physician who performed the transplant, she saw a dentist on January 10, 2006, prior to undergoing this procedure. On April 15, 2010, Dr. Valmont Desa, an oral surgeon, diagnosed Gilliland with osteonecrosis of the jaw ("ONJ").

On April 16, 2012, Gilliland filed this lawsuit in the United States District Court for the Central District of California, asserting the following five claims: (1) strict liability; (2) negligent manufacture; (3) negligent failure to warn; (4) breach of express warranty; and (5) breach of implied warranty. *See* Compl. (Clerk's No. 1) ¶¶ 20–49. On October 24, 2012, howev-

---

1. Novartis has not designated whether this Motion is a motion to dismiss, to strike, for summary judgment, or some other type. After carefully reviewing the Motion, the Court finds that it most closely resembles a summary judgment motion, and will treat it accordingly.

2. Novartis requests an oral argument. *See* Clerk's No. 82. Because the Court has determined that an oral argument would not substantially aid it in ruling on this Motion, *see* LR 7(c), Novartis's request is denied.

3. The Court finds that its ruling on Novartis's Motion will not benefit from a detailed recitation of the facts in this case. If specific facts become critical to the Court's analysis, they will be set forth in Section III below.

er, the case was transferred to this Court pursuant to the parties' stipulation. *See* Clerk's Nos. 10–11. The primary dispute in this lawsuit centers on whether Gilliland's oncologists were aware of the association between bisphosphonates [4] and the risk of ONJ at the time they recommended and prescribed the Zometa treatment to her.

## II. STANDARD OF REVIEW

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[5] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay." [6] *Id.* at 281. Indeed, "judges are duty-bound to

resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda . Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party

---

4. Zometa belongs to a class of medications known as bisphosphonates.

5. Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

6. Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment.

*Id.* at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 & 10 Wright & Miller, *Federal Practice & Procedure* § 2712 (3d ed.1998)).

## III. LAW AND ANALYSIS

Novartis contends that, as a matter of law, Gilliland cannot recover punitive damages, and advances a two-fold argument in support. First, New Jersey law, which Novartis claims governs the punitive dam-

ages issue, precludes recovery of such damages in products liability lawsuits involving medications approved by the Food and Drug Administration ("FDA"). Def.'s Mot. (Clerk's No. 82) at 1. Second, Novartis maintains that punitive damages are unavailable even if the Court concludes that Iowa, not New Jersey, law governs the issue. *Id.* at 2.

### A. *Choice of Law*

■ As a threshold matter, the Court must determine which State's law—Iowa or New Jersey—governs the punitive damages issue. "In a diversity action, a district court sitting in ... [Iowa] follows ... [Iowa's] choice-of-law rules to determine applicable state law." *Wolfley v. Solectron USA, Inc.*, 541 F.3d 819, 823 (8th Cir.2008) (internal citation and quotation marks omitted). The parties agree that when deciding choice-of-law issues, Iowa courts apply the most significant relationship test set forth in the Restatement (Second) of Conflicts of Laws ("Restatement"). *Compare* Def.'s Mem. in Supp. of Its Mot. ("Def.'s Br.") (Clerk's No. 82–1) at 14 *with* Pl.'s Resp. in Opp'n To Def.'s Mot. ("Pl.'s Resistance Br.") (Clerk's No. 94) at 10. In applying this test, the Court's analysis is guided by the factors listed in Restatement §§ 6 and 145(2). *See Jones v. Winnebago Indus.*, 460 F.Supp.2d 953, 965 (N.D.Iowa 2006). First, the Court must evaluate "the 'contacts' listed in § 145(2) ... according to their relative importance with respect to the particular issue." *See id.* (internal citation and quotation marks

omitted). Second, the Court should "consider the [Restatement's] § 6 'factors' in light of the pertinent 'contacts.'" *See id.*

### 1. *Section 145(2) "contacts."*

■ Section 145(2) contains the following relevant "contacts": "(a) the place where the injury occurred,[7] (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." For reasons that follow, the Court finds that these "contacts" weigh heavily in favor of applying Iowa law to the punitive damages issue in this case.

### a. *Place of misconduct.*

■ "The state in which the misconduct occurs is the contact that bears the most significance to the issue of punitive damages." *In re NuvaRing Prods. Liab. Litig.*, 957 F.Supp.2d 1110, 1115 (E.D.Mo. 2013) (citing Restatement § 145 cmt. c). "[I]n a products liability case ..., in which the plaintiff[ ] allege[s] ... [a] defective warning, the conduct causing injury is, at least primarily, the ... marketing of the allegedly defective product."[8] *Jones*, 460 F.Supp.2d at 970; *accord In re NuvaRing Prods. Liab. Litig.*, 957 F.Supp.2d at 1115 (finding that "the majority of the misconduct occurred in Missouri" because, *inter alia*, the defendant "employed sales repre-

---

**7.** Gilliland asserts that her injury occurred in Iowa, *see* Pl.'s Resistance Br. at 10, and Novartis does not dispute this assertion.

**8.** Novartis contends that there is no evidence in the record suggesting that any of Novartis's sales representatives contacted Gilliland's oncologists for the purpose of promoting Zometa. *See* Def.'s Reply in Supp. of Its Mot. (Clerk's No. 103) at 2. The Court is not persuaded for at least two reasons. First, as a

general proposition, the marketing of a product is by no means limited to the promotion of the product by the manufacturer's sales representatives. Second, when viewed in the light most favorable to Gilliland, the fact that Novartis sent "Dear Doctor" letters to Gilliland's oncologists permits the reasonable inference that Zometa, a cancer drug, was being marketed to them. *See* Order (Clerk's No. 119) at 15 n. 16.

sentatives in Missouri who, when promoting NuvaRing, allegedly failed to warn ... [the plaintiff's] physician of NuvaRing's dangers"). Additionally, several courts have concluded that " 'the conduct causing injury in a prescription drug products liability case, including failure to warn and warranty cases, occurs primarily where the injured party was prescribed and ingested the drug.'"[9] *See In re NuvaRing Prods. Liab. Litig.*, 957 F.Supp.2d at 1115 (internal citations omitted). Therefore, the Court concludes that this § 145(2) "contact" weighs in favor of applying Iowa law to the punitive damages issue.[10]

### b. *Place of domicile, residence, incorporation, or business.*

"In the case of other torts [i.e., other than reputation, financial injury, or invasion of privacy torts], the importance of these contacts depends largely upon the extent to which they are grouped with other contacts." Restatement § 145(2) cmt. e. Thus, by itself, the fact that Gilliland is an Iowa resident "carr[ies] little weight" in terms of convincing the Court that Iowa, as opposed to New Jersey, is

the State that bears the most significant relationship to the issue at hand. *See id.* Because this "contact," however, is "grouped" with the place of injury, which the parties agree occurred in Iowa, and with the place of Novartis's alleged misconduct, which, at least in part, also took place in Iowa, the Court concludes that Gilliland's domicile weighs in favor of applying Iowa law to the issue of punitive damages.[11] *See id.* ("The state where these contacts are grouped is particularly likely to be the state of the applicable law if either the defendant's conduct or the plaintiff's injury occurred there."); *see also Jones*, 460 F.Supp.2d at 971.

### c. *Place where the relationship between the parties is centered.*

The locus of the relationship between the plaintiff-patient and the defendant-drug manufacturer is the State where the plaintiff-patient suffered from the alleged warning defect, not the State where the defendant-drug manufacturer issued the warnings at issue. *See Cornett v. Johnson & Johnson*, 414 N.J.Super. 365, 998 A.2d 543, 552 (2010) (citing *Bearden v. Wyeth*,

---

9. Gilliland concedes that at least some of her Zometa infusions were performed in Nebraska. *See* Pl.'s Resistance Br. at 10. Although this fact dilutes to a certain extent Gilliland's argument that Iowa bears the most significant relationship to the punitive damages issue, it does nothing to bolster Novartis's contention that the Court should apply New Jersey law to this issue. *Cf. In re NuvaRing Prods. Liab. Litig.*, 957 F.Supp.2d at 1115 n. 4.

10. Because Gilliland's injury occurred in Iowa and because at least part of Novartis's alleged misconduct also occurred in Iowa, the Court need not analyze the remaining two § 145(2) "contacts." *See* Restatement § 145(1) cmt. d ("[T]he local law of the state where conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protec-

tion."); *see also Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1358–59 (8th Cir.1994) ("In cases in which the injury and the conduct causing the injury occur in the same state, the Restatement principles are easy to apply.... The choice of law becomes more complex, however, where the injury and the conduct causing the injury take place in separate states." (internal citation omitted)). For the sake of completeness, however, the Court will nevertheless analyze these two remaining "contacts."

11. To be fair, Novartis's principal place of business, New Jersey, can probably be "grouped" with the place of misconduct "contact" because at least some of Novartis's alleged misconduct may have occurred in New Jersey. Thus, although this "contact" seems to also favor the application of New Jersey law, it does so to a lesser degree than it favors Iowa law.

482 F.Supp.2d 614, 620 (E.D.Pa.2006)). Although Gilliland's oncologists were located in Nebraska, she received her Zometa infusions in both Nebraska and Iowa. It is undisputed, however, that none of the infusions were done in New Jersey. Accordingly, although the relationship between the parties in this case is probably centered in both Nebraska and Iowa, no reasonable interpretation of the record before the Court would suggest that New Jersey is also a relationship locus. Thus, even though Iowa is probably not the only locus of the relationship between Gilliland and Novartis, this "contact" nevertheless supports the conclusion that Iowa bears a more significant relationship to the punitive damages issue than New Jersey.

### 2. Section 6 "factors."

Having completed the § 145(2) analysis, the Court must now consider the Restatement's § 6 "factors" to the extent that these "factors" are relevant given the pertinent § 145(2) "contacts." See Jones, 460 F.Supp.2d at 972 ("Evaluation of the § 145(2) 'contacts' is not the end of the conflict-of-laws analysis, however, because as § 145(1) makes clear, the question is which state 'has the most significant relationship to the occurrence and the parties under the principles stated in § 6,' ... and also makes clear that the § 145(2) 'contacts' are merely the '[c]ontacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue.'" (internal citations omitted)). The "factors" in question are as follows:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement § 6. In *In re NuvaRing Products Liability Litigation*, a prescription drug products liability lawsuit, the United States District Court for the Eastern District of Missouri faced the same task currently before the Court—to determine whether to apply New Jersey or Missouri law to the issue of punitive damages. See 957 F.Supp.2d at 1111. After conducting the § 145(2) analysis, the court turned to the application of the § 6 "factors" and stated as follows:

Organon argues that the "justified expectations" of the parties weighs in favor of New Jersey law. However, "the protection of the justified expectations of the parties, which is of extreme importance in such fields as contracts, property, wills and trusts, is of lesser importance in the field of torts[;] ... persons who cause injury ... unintentionally ... usually act without giving thought to the law that may be applied...." Restatement (Second) cmt. b. Similarly, "the values of certainty, predictability and uniformity of result are of lesser importance in torts" than in areas like contracts or estates where the parties are likely to plan their transactions in accordance with applicable law. See id. Moreover, Missouri's status as the locus of the parties' relationship militates against Organon's claim that it justifiably expected New Jersey law would govern Missouri NuvaRing claims. Organon sold and marketed NuvaRing in Missouri. In doing so, Organon should

have expected to be subjected to Missouri law regulating such conduct.

Organon argues that applying New Jersey law would simplify the determination and application of a punitive damages analysis. It bases this argument upon a ruling by that state's courts that essentially bars all punitive damages in pharmaceutical cases where the FDA approves the label. *See, e.g., McDarby v. Merck & Co., Inc.,* 401 N.J.Super. 10, 949 A.2d 223, 276 (N.J.Super.Ct.App.Div.2008) (finding exception preempted by Federal Food Drug and Cosmetic Act). However, federal courts are not bound by state court rulings on preemption. *See Casey v. FDIC,* 583 F.3d 586, 592 (8th Cir.2009). Moreover, federal courts have reached differing conclusions on the preemption issue. *See Zimmerman v. Novartis Pharm. Corp.,* 889 F.Supp.2d 757, 767–68 (D.Md. 2012) (discussing divergence). Contrary to Organon's argument, I find that applying New Jersey law to punitive damages would entail more difficulty in applying the law.

An analysis of the states' interests does not yield a result favoring New Jersey law. New Jersey adopted its products liability law in order to "limit[ ] the liability of manufacturers of FDA-approved products by reducing the burden placed on them by product liability litigation." *Rowe v. Hoffman–La Roche, Inc.,* 189 N.J. 615, 917 A.2d 767, 774 (N.J.2007). In doing so, the New Jersey legislature "balanced the need to protect individuals against the need to protect an industry with a significant relation-

ship to [its] economy and public health." *Id.* Missouri allows punitive damages in order to punish and deter similar conduct. *See Vaughan v. Taft Broad.[ ] Co.,* 708 S.W.2d 656, 660 (Mo.Banc 1986) [ (en banc) ]. Moreover, Missouri presumably considered the effect that its laws would have upon its own economy when it placed limits upon the amount of punitive damages. This case presents a true conflict of laws, because both New Jersey and Missouri have interests that would be furthered by applying their respective statutes to Prather's claim. While New Jersey has an interest in protecting its corporations from the burdens of frivolous lawsuits, that interest is diminished where the defendant corporation's conduct occurs outside the state. *Cf. Rowe,* 917 A.2d at 776 ("To allow a life-long Michigan resident who received an FDA-approved drug in Michigan and alleges injuries sustained in Michigan to by-pass his own state's law ... overvalu[es] [New Jersey's] true interest in this litigation."). Organon allegedly engaged in misconduct in Missouri and in doing so injured a Missouri citizen in Missouri. Having considered the principles set forth in Section 6, I find that Missouri has the most significant relationship to the parties and occurrences. Missouri law will govern punitive damages.

*Id.* at 1116–17. Unlike Organon, the defendant in *In re NuvaRing Products Liability Litigation,* Novartis does not raise any specific arguments why the application of the § 6 "factors" in this case favors New Jersey law.[12] *See generally* Def.'s

---

12. In fairness, Novartis does make one argument involving the § 6 "factors"—it claims that New Jersey law should govern the punitive damages issue because "New Jersey has a strong policy of limiting punitive damages in products liability lawsuits involving FDA-approved drugs." *See* Def.'s Br. at 15. For the

reasons expressed in *In re NuvaRing Products Liability Litigation,* the Court finds that this "factor" is neutral, and, accordingly, does not compel the conclusion that New Jersey law should apply. *See* 957 F.Supp.2d at 1116 ("This case presents a true conflict of laws, because both New Jersey and Missouri have

Br. & Def.'s Reply In Supp. of Its Mot. (Clerk's No. 103). Therefore, the Court concludes that Novartis is not entitled to a judgment as a matter of law that New Jersey is the forum with the most significant relationship to the punitive damages issue.

### B. *Punitive Damages Under Iowa Law*

 Novartis argues that even if Iowa law applies to the punitive damages issue, the Court should still conclude, as a matter of law, that such damages are not recoverable because there is no evidence that Novartis acted with willful or wanton disregard for Gilliland's safety. *See* Def.'s Br. at 17–18. Gilliland counters, claiming that there is a jury question as to Novartis's state of mind in relation to the alleged warning defect. *See* Pl.'s Resistance Br. at 11–12. For reasons that follow, the Court agrees with Gilliland.

 "Punitive damages are justified where a defendant acts maliciously. The malice may be actual (express), such as personal spite, hatred, or ill will, or it may be legal (implied), as where the defendant acts illegally or improperly with willful or reckless disregard for another's rights [or safety]." *Freeman v. Bonnes Trucking*, 337 N.W.2d 871, 879–80 (Iowa 1983) (internal citation omitted). Deciding whether to award punitive damages is a question within the province of the jury, *see Sebastian v. Wood*, 246 Iowa 94, 66 N.W.2d 841, 845 (1954), especially where, as in this case, a reasonable jury, viewing the record evidence in the light most favorable to Gilliland, could conclude that, in fashioning its warning regarding the bisphosphonate-related risk of ONJ, Novartis acted "with willful or reckless disregard for" Gilliland's safety because it did not adequately disclose such risk. *See* Order (Clerk's No. 119) at 15 n. 16 ("A reasonable jury, view-

ing the contents of the "Dear Doctor" letter in light most favorable to Gilliland, could conclude that the warning of the risk of ONJ is not adequate because the changes to the package insert dealing with such risk suggest that the ONJ developed by patients on bisphosphonates may be due to other factors—chemotherapy, corticosteroids, osteomyelitis or other local infection, cancer, poor oral hygiene, anemia, pre-existing oral disease."). Accordingly, whether, under Iowa law, Novartis's alleged misconduct is one deserving of punitive damages is not a question that the Court can resolve on summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion (Clerk's No. 82) is DENIED.

IT IS SO ORDERED.