483 F.2d 599
 In the Matter of FOUR SEASONS NURSING CENTERS OF AMERICA,
INC., Debtor-Appellee, as relating to Four Seasons
Overseas, N. V., et al. subsidiaries to
the original debtor.
In the Matter of FOUR SEASONS EQUITY CORPORATION, Debtor-Appellee.
Northern Illinois Mortgage Co., Appellant.
 No. 72-1763.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted May 22, 1973.
Decided Aug. 22, 1973.
 
 John W. Swinford, Oklahoma City, Okl., for appellant, Northern Ill. Mortgage Co.
 Robert E. Manchester, Oklahoma City, Okl., for debtor-appellees Four Seasons Nursing Centers of America, Inc., Four Seasons Overseas, N. V., Embassy Construction Co., Inc., National Medical Supply, Inc., Four Seasons Franchise Centers, Inc., Four Seasons Equity Corp.
 Before PICKETT, McWILLIAMS and BARRETT, Circuit Judges.
 McWILLIAMS, Circuit Judge.
 
 
 1
 This is a bankruptcy case. Four Seasons Equity Corporation and Four Seasons Nursing Centers of America, which entities will hereinafter be referred to as Four Seasons, were in the business of constructing and operating nursing homes, and in connection therewith owned certain property in Rockford, Illinois, on which it proposed to build a nursing home. Needing financing to begin this particular project, Four Seasons entered into a loan commitment agreement with Northern Illinois Mortgage Co., a lending institution. By this agreement, Northern committed itself to make a construction loan to Four Seasons in the sum of $900,000, and in return therefor Four Seasons agreed, inter alia, to pay a loan commitment fee of 3% of $900,000, namely $27,000. And the single issue in this appeal is when this fee was earned.
 
 
 2
 As concerns the loan commitment fee, the loan commitment agreement provides as follows:
 
 
 3
 "The construction loan fee will be 3% of the amount of the mortgage; 1% payable at the time of the first disbursement; 1% payable when the first one-half of the construction loan is disbursed; and, 1% upon final disbursement."
 
 
 4
 Northern made an initial disbursement of $360,000, and at that time Four Seasons paid Northern $9,000, this sum representing one-third of the total loan commitment fee. Thereafter, Four Seasons entered into a Chapter X bankruptcy proceeding and Four Seasons did not draw any additional monies from the sum Northern had committed itself to lend.
 
 
 5
 Northern filed a secured claim in the Chapter X proceeding in the amount of $360,000, which was allowed by the bankruptcy court as a first mortgage lien against the Rockford property. Additionally, Northern also filed an unsecured claim for $18,000, representing the balance due on the total loan commitment fee, which Northern asserted was fully earned even though it had only actually lent Four Seasons $360,000. This claim was resisted by the trustee on the ground that it could not be verified on the books of Four Seasons. After hearing, a Special Master recommended that this particular claim be disallowed, and, upon review, the District Court for the Western District of Oklahoma approved such recommendation and disallowed the claim.
 
 
 6
 As far as the record before us reveals, neither the Special Master nor the district court gave any reason for their disallowance of the claim, and hence we do not have the benefit of their thinking on the matter. However, as indicated, the position of Northern is that the entire fee was fully earned when the loan commitment agreement was entered into, and that the deferred payments were merely an accommodation to Four Seasons. It is the position of Four Seasons that the contract provision is ambiguous and should accordingly be construed against the party causing the uncertainty to exist, which in this instance was Northern, who drew the agreement. Alternatively, the trustee argues that in a bankruptcy proceeding the court is empowered to do equity and that the disallowance of the claim was well within its broad equitable powers.
 
 
 7
 Before examining the law on this subject, we note that the only evidence before the Special Master as to the meaning of the agreement came from the former vice-president of Four Seasons who had himself negotiated the loan commitment agreement with Northern. It was his testimony that the entire commitment fee was earned when the agreement was signed, and that the deferred payments were simply an accommodation to Four Seasons. Additionally, this witness also testified that a commitment fee of 3% of the total amount committed was not excessive and was in line with the amounts being thus charged by other lenders.
 
 
 8
 Loan commitment fees have been referred to as a "fact of financial life" and have been the subject of considerable judicial discussion. Contracts calling for the payment of a loan commitment fee by the borrower to the lender have generally been enforced, even though the borrower for one reason or another does not thereafter draw on the committed funds, or does not draw out the committed amount in its entirety. Enforcement of the payment of such fees, or the refusal to grant a refund where the fee has been paid, has been on the ground that the consideration for the fee is the promise of the lender to commit a specified sum of his money for a specified time for the use and benefit of the lender and that the lender's obligation to commit, as well as the borrower's obligation to pay a fee in return for such commitment, is fixed as of the date of the loan commitment agreement is executed. And it has been held that the fact that the borrower thereafter does not draw on the committed funds does not excuse the borrower from payment of the entire commitment fee as called for in the loan commitment agreement. For a general discussion of loan commitment fees, see such cases as White Lakes Shopping Center, Inc. v. Jefferson Standard Life Insurance Company, 208 Kan. 121, 490 P.2d 609 (1971); Goldman v. Connecticut General Life Insurance Co., 251 Md. 575, 248 A.2d 154 (1968); and Paley v. Barton Savings and Loan Ass'n, 82 N.J.Super. 75, 196 A.2d 682 (1964).
 
 
 9
 In Goldman v. Connecticut General Life Insurance Co. appears the following pertinent background statement, 248 A. 2d at 157:
 
 
 10
 "In today's world, the commitment fee has become a fact of financial life. Most large projects are financed under agreements substantially similar to the one entered into between Greenspring and Connecticut. [Citing cases]. The commitment fees are substantial, but are usually stated as a small percentage of the amount ultimately to be loaned. The courts, in holding that the fees were non-refundable in the event that the project is abandoned or that the borrower fails to take down the funds, have supported their conclusions by finding that the fee was intended to constitute liquidated damages, as in Boston Road [Boston Road Shopping Center v. Teachers Ins. & Annuity Ass'n, 13 A. D.2d 106, 213 N.Y.S.2d 522 (1961), aff'd 11 N.Y.2d 831, 227 N.Y.S.2d 444, 182 N.E.2d 116 (1962)]; as a fee for the commitment, as in Regional Enterprises and Paley [Regional Enterprises, Inc. v. Teachers Ins. & Annuity Ass'n, 352 F.2d 768 (9th Cir. 1965), and Paley v. Barton Savings & Loan Ass'n, 82 N.J.Super. 75, 196 A. 2d 682 (1964), aff'd 41 N.J. 602, 198 A.2d 446 (1964)]; as a stand-by fee, as in Chambers [Chambers & Co. v. Equitable Life Assurance Soc., 224 F. 2d 338 (5th Cir. 1955)]; or as standby interest, as in Continental Assurance [Continental Assurance Co. v. Van Cleve Bldg. & Const. Co., 260 S. W.2d 319 (Ct.App.Mo.1953)]."
 
 
 11
 Based on the rationale of the foregoing authorities, Northern asserts that the entire commitment fee, as called for by the loan commitment agreement, namely, 3% of $900,000, or $27,000, became "fully earned" on the date the agreement was signed, and that the fact that payments were on a deferred basis did not alter such obligation. As concerns the matter of deferred payments of a loan commitment fee, counsel draws our attention to such cases as Wisznia v. Wilcox, 438 S.W.2d 874 (Tex.Ct.Civ. App.1969), where it was held that if the parties intend that a debt shall be absolute, and merely fix upon some future event as a convenient time for payment, the debt is not contingent and if the future event does not occur, the law will require the payment to be made within a reasonable time. In support of the foregoing, see Williston on Contracts, Third Edition, Vol. 5, Sec. 799. See also Byler v. Great American Insurance Company, 395 F.2d 273 (10th Cir. 1968), where, after recognizing that a contract may contain a condition which makes performance dependent upon the happening of a future event, we nonetheless observed that courts generally look with disfavor upon such contract stipulations and will not construe them as conditions precedent unless required to do so by the plain and unambiguous language of the contract. It is on this general basis, then, that Northern asserts that its claim for $18,000, i. e., the unpaid balance of the total commitment fee, should have been allowed.
 
 
 12
 Four Seasons resists this claim on two grounds: (1) The contract as it concerns the loan commitment fee and the dates for payment thereof is ambiguous and should accordingly be construed against Northern; and (2) in a bankruptcy proceeding, the court is empowered to sift the circumstances surrounding any claim to see that "injustice and unfairness" is not done and that to allow this claim would be "inequitable." In our view, neither of these arguments is tenable.
 
 
 13
 As mentioned above, the only testimony before the Special Master came from the former vice-president of Four Seasons, who had himself negotiated the loan commitment with Northern. His testimony, which is in nowise refuted, was to the effect that the 3% loan commitment fee was not excessive and was fully earned when the agreement was signed and that the deferred payments were only an accommodation to Four Seasons. On this state of the record, then, any ambiguity, if such there be, was cleared up in favor of Northern and, under such circumstances, the contract should not be given a meaning different from the meaning given the contract by both of the parties thereto. United States v. F. D. Rich Company, 434 F.2d 855 (9th Cir. 1970); Demarco v. Edens, 390 F.2d 836 (2d Cir. 1968); El Paso Natural Gas Company v. Kelly, 308 F.2d 820 (10th Cir. 1962); and Eastmount Const. Co. v. Transport Mfg. & Equip. Co., 301 F.2d 34 (8th Cir. 1962). Accordingly, although we do not know the reason for the action of either the Special Master or the trial court, the disallowance of the claim cannot be upheld on the ambiguity argument.
 
 
 14
 Four Seasons argues, alternatively, that the disallowance of the claim was well within the broad equitable powers possessed by a bankruptcy court. In this regard our attention has not been drawn to any case where an otherwise valid and lawful claim has been disallowed in a bankruptcy proceeding solely on so-called "equitable" grounds unless there be operative facts which would themselves bring into play recognized equitable principles. In the instant case, we perceive of no facts or circumstances which would form the basis for denying on equitable grounds Northern's claim.
 
 
 15
 The principal cases relied on by Four Seasons in this phase of their argument in fact support the contrary of the proposition. In Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), it was declared that bankruptcy courts, in passing upon the validity of a claim, exercise equity powers and have not only the power, but the duty to disallow claims to the end that, for example, "fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantive justice from being done." Id. at 305, 60 S.Ct. at 244. And in Pepper, the claim disallowed would have inured to the benefit of one who owed a fiduciary duty to the bankrupt, thus bringing into play long recognized principles of equity. In the instant case, there are not even overtones of fraud.
 
 
 16
 Similarly, Rader v. Boyd, 252 F.2d 585 (10th Cir. 1957), does not really support the position taken by Four Seasons. In that case, we did state that, in accord with Pepper, a bankruptcy court exercises "equitable powers of broad sweep" and that accordingly it is empowered to sift the circumstances to insure that "injustice or unfairness" is not done in the administration of the bankrupt's estate. In Rader, however, it was determined that there was no fiduciary duty owed the bankrupt by the claimant and that accordingly the claim should be allowed. So, in Rader, as in the instant case, there were no operative facts sufficient to invoke equitable principles which would defeat an otherwise lawful claim against the bankrupt. Merely because a court may be exercising equitable powers does not permit it to change the terms of a contract in the absence of fraud, accident or mistake. Manufacturers' Finance Co. v. McKey, Trustee in Bankruptcy, 294 U.S. 442, 55 S.Ct. 444, 79 L.Ed. 982 (1935), and Hedges v. Dixon County, 150 U.S. 182, 14 S.Ct. 71, 37 L.Ed. 1044 (1893).
 
 
 17
 In sum, then, Northern's claim is based on a valid, binding contract whereby Northern committed itself to lend Four Seasons up to $900,000 and in return therefor Four Seasons agreed to pay a loan commitment fee of $27,000. This obligation to pay a commitment fee was fixed and fully earned when the loan commitment agreement was signed, and the fact that Four Seasons did not borrow the full $900,000 is of no consequence. On the basis of the authorities set forth above, we see no real ambiguity in the loan commitment agreement; but if there be an ambiguity, on the basis of the record, i. e., the undisputed testimony of the former vice-president of Four Seasons, any ambiguity arising from the fact of deferred payments of the fee must under the circumstances of this case be resolved in favor of the interpretation argued for by Northern. Neither the Special Master nor the trial court could under the circumstances substitute their interpretation of the contract for that of the contracting parties. And finally, the claim cannot be disallowed on equitable grounds where there are no operative facts which would justify application of any equitable principle to defeat an otherwise lawful claim.
 
 
 18
 Judgment reversed and cause remanded with directions that Northern's claim be allowed.