**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY.**

**Appeal of UNITED STATES of America.**

Nos. 86–1755, 87–1291.

United States Court of Appeals, Third Circuit.

Argued Aug. 18, 1987.

Decided Oct. 22, 1987.

Richard K. Willard, Asst. Atty. Gen., Michael F. Hertz, Alan E. Kleinburd (argued), Kathleen M. Miko, U.S. Dept. of Justice, Washington, D.C., G. Joseph King, Washington, D.C., of counsel, for appellant, United States of America.

James E. Howard (argued), Warren D. Hutchison, John B. Kinsellagh, Kirkpatrick & Lockhart, Boston, Mass., for appellee, The Penn Cent. Transportation Company.

Before GIBBONS, Chief Judge, and WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

The United States appeals from two district court orders which, in effect, rejected the government's request for reimbursement in the Penn Central reorganization proceedings. The government advanced an application for reimbursement pursuant to contracts entered into under section 215 of the Regional Rail Reorganization Act of 1973. 45 U.S.C. § 725 ("4R Act"). We will reverse.[1]

## I.

In 1970, Penn Central Transportation Company filed a petition for reorganization. When neither Penn Central nor any other northeastern railroads could achieve an income-based reorganization in reorganization court, facing possible liquidation, Congress enacted the 4R Act, 45 U.S.C. §§ 701–797, creating a new railroad, Consolidated Rail Corporation ("Conrail"), to which Penn Central and other bankrupt railroads would convey their principal rail assets. The 4R Act also created the United States Railway Association ("USRA"), developing a Final System Plan designating those rail properties to be conveyed to Conrail. Congress, providing a means for keeping the railroad in operation during development of the Final System Plan, devised two funding mechanisms: (1) § 213, 45 U.S.C. § 723, and (2) § 215, 45 U.S.C. § 725.

Section 213 of the 4R Act, 45 U.S.C. § 723, as originally enacted, authorizes interim cash assistance in the form of cash grants to the bankrupt railroads, permitting them to continue their operations during the planning period. Congress also provided funds under section 215 of the 4R Act, 45 U.S.C. § 725, for rehabilitation of rail properties conveyed to Conrail. Section 215, as originally enacted, authorizes the Secretary of Transportation, together with the USRA's approval, to enter into

---

1. The district court had jurisdiction pursuant to section 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205 (repealed 1978). While the Bankruptcy Act was replaced by the Bankruptcy Code on October 11, 1979, the Penn Central reorganization proceedings were commenced in 1970. The prior act governs. See Pub.L. 95–598, Title IV, § 403(a), 92 Stat. 2549, 2683 (1978). The orders appealed from are Order No. 4292 and No. 4298. The latter finally denied the government's Amended Petition for Payment and disallowed its claim for $22.3 million. The parties agree that Order No. 4298 is a final order. Thus we have appellate jurisdiction. 28 U.S.C. § 1291. Since the issues presented by both orders are the same, Penn Central's motion to dismiss the government's appeal from Order No. 4292 is moot.

agreements with the bankrupt railroads for improvement of rail properties transferred to Conrail. USRA loans, in the amount of $150 million, were provided to fund the improvement agreements. Conrail, upon conveyance of the property on April 1, 1976, was required by section 215 to assume the debt obligations and repay the Government. Conrail, however, was not required to compensate the railroads for such added value to the properties conveyed to Conrail as resulting from the rehabilitation financed by section 215 funds.

By late 1974, it was apparent, however, that the funds appropriated under section 213 for continuing operation were inadequate. In November, 1974, the Trustees met with representatives of the Department of Transportation ("DOT") to advise them that the section 213 grant funds could not stem Penn Central's impending cash crisis. The Trustees notified the government of their intention to reduce expenses by various self-help measures, including cut backs in maintenance. DOT objected to the Trustees' proposed self-help measures, concerned that Penn Central would implement cutbacks in maintenance programs which "might prove detrimental to the ability of Penn Central (or Conrail) to provide necessary transportation services." DOT letter to Trustees dated Jan. 10, 1975.

In early 1975, DOT proposed substantial amendments to sections 213 and 215 of the Rail Act. In response, Congress enacted the Regional Rail Reorganization Act Amendments of 1975, the primary purpose of which was to provide the funding necessary to ensure continued rail services pending conveyance to Conrail. Pub.L. 94–5, 89 Stat. 7. The total amount available for grants under section 213 was increased, with the clear understanding that the grants were to be given only as a last resort. Section 215 was amended to permit funds to be used not only for capital improvements, but also for "program maintenance." Although not defined, program maintenance was generally understood to encompass regular maintenance of track, equipment, or other facilities and rehabilitation projects which were included in the railroad's regular budgets and cash forecasts.

In addition, the 1975 amendments doubled the aggregate amounts which could be issued under section 215 from $150 million to $300 million. The amendments made no change in the repayment provision requiring Conrail to repay debt obligations made under section 215. The government retained discretion to forgive such obligations. Because of the inclusion of "program maintenance" under section 215, most section 215 expenditures were now not likely to increase the value of the conveyed properties. USRA was, therefore, required to decide what amount of section 215 expenditures would become Conrail's obligation and from what amount Conrail would be released.

Following the 1975 amendments, the government and the bankrupt railroads entered into numerous section 215 agreements. A hearing was held on each agreement prior to the trustee's signing of the respective instruments. Further, the district court entered an order authorizing the Trustees to enter into each agreement. Among them were the four involved in this appeal: (1) DOT–RRRA–715 for the purchase of maintenance of way equipment; (2) DOT–RRRA–754 for the purchase of maintenance of way materials; (3) DOT–RRRA–775 for the installation of maintenance of way materials; and (4) DOT–RRRA–7515 for the performance of maintenance of equipment. (These four agreements are referred to collectively hereafter as "the section 215 agreements.") The section 215 agreements were funded in advance by the government, which provided the Trustees with an amount of cash sufficient to cover the estimated expenses under the contracts for the upcoming month. The Trustees deposited this cash into separate accounts and could withdraw funds as needed.

When the section 215 projects terminated, Penn Central had received approximately $212 million in section 215 funds for program maintenance. Pursuant to the section 215 contracts, Penn Central submitted final accountings of all funds depos-

ited in, credited to, and disbursed from the separate accounts at the end of each section 215 project. Also pursuant to the contracts, the Defense Contract Audit Agency audited these accountings and concluded that Penn Central had received more than the $33.8 million stipulated under the agreements. Thereafter, the government made a formal demand of Penn Central for the return of these monies. After negotiation, spanning several years, the government reduced its $33.8 million claim to $22.3 million.

According to the government, the $22.3 million in disallowed costs is a result, *inter alia*, of Penn Central's excessive or double charges for transportation costs, charges for unauthorized work, failure to document claimed expenses and duplicate billings for authorized work.

In February, 1983, the government filed an Amended Petition for Payment seeking $22.3 million, but the parties reached an impasse. The government also invoked the binding arbitration procedures that are contained in two of the four section 215 agreements to resolve disputes arising under those contracts.[2] Penn Central answered, denying that it owed any money to the government. At the same time, Penn Central petitioned the district court for an order enjoining arbitration. Penn Central argued that, even if certain funds were not spent strictly in accordance with the provisions of the four contracts, the government could not recover any section 215 funds from Penn Central as a matter of law. Penn Central further argued that only the district court, not an arbitration panel, could decide the repayment claim.

On April 7, 1983, the district court temporarily stayed arbitration pending a ruling on the merits of Penn Central's petition. After discovery, briefing, and oral argument, on October 15, 1986 the district court issued Memorandum and Order No. 4292. The district court ruled that Penn Central did not have to return section 215 funds which were received pursuant to the agreements but not spent in accordance with the specific terms of those agreements if Penn

Central could show that those funds were spent on projects within the general scope of section 215. The court held that the section 215 agreements could not be viewed and applied in isolation. To ignore the context in which the agreements arose would frustrate the intention of both the contracting parties and congressional intent. "[T]he true purpose of the accounting and audit provisions of the contracts here was to ensure the government's money was properly spent for purposes authorized by § 215, and to ensure that [Penn Central] would not receive more than was actually necessary to sustain rail operations to the date of conveyance." Slip op. at 12.

Thus, the court ruled that if Penn Central could "prove that at least $22 million worth of genuinely section 215–eligible expenditures were made during the relevant pre-conveyance period, over and above the work specified in the contracts, the claims now being asserted by the government must be rejected." Slip op. at 13. Accordingly, Order No. 4292 ordered the government to state whether it disputed that Penn Central had spent at least $22.3 million on projects that were not approved under the section 215 agreements but which were within the general parameters of section 215.

The government appealed from Order No. 4292 (Appeal No. 86–1755) and filed a motion for certification of the order for appeal. 28 U.S.C. § 1292(b). The district court denied the government's request to certify Order No. 4292. Initially, the government advised the district court of an intent to contest Penn Central's assertion that at least $22 million were spent on projects which were eligible for section 215 funding. In February, 1987, Penn Central submitted evidence to the district court demonstrating such expenditures. In a letter dated March 16, 1987, however, the government stated an intention not to challenge Penn Central's expenditures. On May 11, 1987, the district court entered Order No. 4298, disallowing the government's claim against Penn Central. The

2. Agreements DOT–RRRA–751 and DOT–RRRA– 754 do not require arbitration.

government appealed from Order No. 4298 on May 19, 1987 (Appeal No. 87–1291). On June 1, 1987, both appeals were consolidated. The government challenges "the district court's ruling that federal funds spent without contractual authority need not be returned." Gvt's Brief at 5.

## II.

The government challenges the district court's decision on two grounds: a) that the government was foreclosed from enforcing the terms of the four contracts because it was not permitted to prove that funds paid to Penn Central were not spent in accordance with the contractual terms and b) that the district court improperly changed the terms of the contracts with the benefit of hindsight. The government quarrels, not so much that Penn Central received $212 million in section 215 funds, but that Penn Central did not give the Government $212 million worth of improvements on the rail properties which USRA determined were in greatest need of that work. The government's primary argument, then, is that the district court cannot disregard the agreements and legislation requiring section 215 funds to be expended in accordance with the terms of section 215 agreements only.

Conversely, Penn Central, which is no longer in reorganization and no longer a railroad, contends the district court did not alter the agreements but, rather, merely interpreted them in a permissible manner. Penn Central argues alternatively that even if the district court rewrote the section 215 agreements, it is still not liable for the $22.3 million spent on unauthorized program maintenance because: a) there was an implied-in-fact agreement between the government and Penn Central providing that the Trustees would continue, and the government would fund, Penn Central rail operations until the conveyance date; or b) under a theory of quasi-contract, return of the funds in question would unjustly enrich the government; or c) the government is equitably estopped from seeking recovery because it engaged in affirmative misconduct.

## III.

We cannot let the district court's ruling stand because of: 1) the statute's clear language; 2) the precise language of the agreements themselves; 3) the actions of the parties in the course of negotiation and performance of the contracts; and 4) the legislative history of the 1975 amendments to the Rail Act.

Section 215 authorizes the government "to enter into agreements" with the trustees of the bankrupt railroads "to perform the program maintenance on designated rail properties." 45 U.S.C. § 725(a)(1). Section 215(b) requires that the agreements "contain such reasonable terms and conditions as the Secretary may prescribe." *See id.* § 725(b). The government urges that, in accordance with the clear statutory language, the district court must honor section 215 contractual terms. *See United States v. American Trucking Ass'n,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). This clear statutory language, the government further contends, also requires the district court to allow the government to prove damages. Penn Central, on the other hand, characterizes section 215 as not mandating any particular form of agreement, but merely giving the government flexibility in fashioning terms and in implementing the purposes of the statute. Penn Central's argument is unpersuasive. Section 215 does not authorize the expenditure of federal funds for *any* project which would be permissible under section 215. Rather, section 215 expressly authorizes expenditure of funds in accordance with contracts entered into by the government and Penn Central for the purpose, *inter alia,* of program maintenance on *designated* rail properties.

Penn Central's argument is further undone because, though agreements could have been entered into like the one the district court imposed on the parties, the government consciously chose not to. A primary government concern was to control the uses of section 215 funds. Indeed, the government explicitly rejected Penn Central's suggested generalized agree-

ments, believing that detailed agreements would ensure that section 215 funds would be properly expended. *See* Deposition of Charles Hill, App., Doc. 22 at 316 and Affidavit of Asaph Hall, para. 14, App., Doc. 23 at 323. Furthermore, the legislative history also demonstrates that Congress considered but then rejected the idea of providing section 215 funds without limitation. *See infra* pp. 1229–30.

Penn Central also argues that the district court's contractual interpretations are here justifiable because a court may construe an agreement so as to effect the parties' intention, citing *Chicago, R.I. & P. Ry. v. Denver & R.G.R.R.*, 143 U.S. 596, 609, 12 S.Ct. 479, 483, 36 L.Ed. 277 (1892). *See also Dome Petroleum Ltd. v. Employers Mutual Liability Ins. Co.*, 767 F.2d 43, 47 (3d Cir.1985); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir.1980); *O'Brien & Gere Engineers, Inc. v. Taleghani*, 540 F.Supp. 1114, 1116 (E.D.Pa.1982). Penn Central insists that, even if the language of a contract is clear and unambiguous, a court may look at the surrounding circumstances, previous agreements and negotiations, the relationships of the contracting parties and the subject matter of the agreement.

This court has noted, however, "[t]here is a point at which interpretation becomes alteration of the written contract." *See Mellon Bank*, 619 F.2d at 1011. Examination of the four contracts in question evidences that the district court's interpretations were, in effect, alterations of the agreements, when, as the government correctly argues, the agreements set clear and precise guidelines for the use of the section 215 funds.

Indeed, there are numerous examples where the agreements running between Penn Central and the government evidence contractual terms devoid of ambiguity. For example, sections 7.3 and 2.1 of Agreement DOT–RRRA–755 provided that modifications to the contract or to the work program had to be in writing.[3] Section 5.3(e) of the same agreement required Penn Central to submit to the government detailed accountings of expenditures.[4] Section 2.4 required that all work performed under the contract was to be done according to Penn Central's established standards.[5] Section 2.7(c) provided that Penn Central was responsible for correcting, at its own expense, any substandard work. Section 2.3 required Penn Central to submit a detailed work plan to the government for each overall work program, including proposals for the management of the work and the acquisition of necessary equipment and materials.[6] Section 1.1(1) of Agreement DOT–RRRA–755 defined work program as the total program maintenance work which was to be performed on each project. These projects were delineated in Appendix A of the Agreement and identified the exact properties to be repaired. *See* App., Doc. 11 at 134. Quite obviously, by designating which properties were to receive section 215 funding and what work was to be done on those properties, the government retained the right to decide how section 215 funds would be used, presumably by determining which projects would be most beneficial to Conrail.

The section 215 agreements were also specific with respect to costs to be paid to Penn Central for the maintenance projects. Section 5.3, for example, of Agreement DOT–RRRA–755 plainly limited payment by the government to "allowable costs" as defined in section 1.1(a).[7] "Allowable costs" are "costs to the Trustees of the performance of work under [the] Agreement, determined in accordance with the terms of [the] Agreement and the cost principles ... in Appendix B." [8] Still more, the repayment provisions in each contract contain almost identical language, expressly providing that funds paid to Penn Central in excess of allowable costs were to be

---

**3.** *See* App., Doc. 11 at 129, 106.

**4.** *Id.* at 122.

**5.** *Id.* at 112.

**6.** *Id.* at 109.

**7.** *Id.* at 119–23.

**8.** *Id.* at 105.

returned to the government. *See* App., Doc. 9 at 76e (Amendment to Agreement DOT–RRRA–751, Art. IX (f)); Doc. 10 at 95 (Agreement DOT–RRRA–754, Art. VIII (f)); Doc. 11 at 122 (Agreement DOT–RRRA–755, Sec. 5.3(f)); Doc. 12 at 255 (Agreement DOT–RRRA–751, Sec. 4.3(f)).

Penn Central unpersuasively contends that the aforementioned provisions relate only to section 215 funds actually held in the separate accounts pursuant to the four contracts and that they do not create any independent obligation on the part of Penn Central to the government for any claim under the contracts. If the government could not recover funds in excess of allowable risk, all of the contract provisions requiring a certain quality of work for certain prices would be meaningless.

Penn Central misses the point by arguing that because section 215 maintenance was a grant program, no repayment is necessary. True enough, section 215 funds expended in accordance with the contracts need not be repaid. But, Penn Central has no authority to extend the proposition that *all* section 215 funds, even if not expended pursuant to the contracts, need not be reimbursed if the expenditures would have qualified as section 215 projects. Again, if the government could not recover funds to which Penn Central was not contractually entitled, then the section 215 agreements would be rendered meaningless. *Cf. Bennett v. Kentucky Dep't. of Educ.*, 470 U.S. 656, 669, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590 (1985) (states agree to follow Federal Government established guidelines for the allocation and use of Title I funds and, when used contrary to terms of the grant agreement, reimburse misused funds); *Bell v. New Jersey*, 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983).

The lengthy, intricate negotiations conducted by both sides, moreover, demonstrate that both parties understood the terms of the contracts as written and agreed to be bound by their terms. *See* Gvt's Brief at 13–16. Further evidence of the parties' intention is the court hearings which were held to determine whether to authorize the trustees to enter the con-

tracts. One reason for the hearings was to assure the court that the parties understood the contract terms.

As a further matter, the actions of Penn Central and the government during the course of the contract's performance demonstrates that both parties understood their terms. For instance, Penn Central maintained the required accounting system to capture costs pursuant to the agreements. *See* App., Doc. 25 at 339; Doc. 26 at 345. When Penn Central's Chief Engineer, Ben Gordon, wished to add certain properties or projects to the work program, he submitted written requests to the government. *See,* App., Doc. 27 at 348–49; Doc. 28 at 350. The government, in turn, either authorized or rejected the additional work. *See* App., Doc. 29 at 351; Doc. 30 at 353; Doc. 31 at 354.

Thus, the statute's unambiguous language, the section 215 agreements themselves, the actions of the parties during negotiation and performance of the agreements, and the legislative history of the 1975 Rail Act Amendments (discussed *infra*), indicate the government's clear right to decide which work would be most beneficial to Conrail. Further, the language indicates Conrail's right to determine what constitutes a fair and reasonable price and to demand repayment of funds paid in excess of allowable costs. As we have said before, we will not strain the clear language of a contract's provision to create an ambiguity where, as here, none existed. *Gulf Oil Corp. v. Federal Power Comm'n*, 563 F.2d 588, 595 (3d Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978).

The district court's interpretation of the agreements is totally at odds with their clear language and with the parties' own actions and is therefore impermissible. We are obliged to give effect to the section 215 agreements because they contain clear and unambiguous terms, obviously understood by the parties. *See Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir.1973) (a contract must be interpreted in light of the meaning which the parties have accorded it as evidenced by

their performance of the terms of the contract); *Brokers Title Co. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174, 1178 (3d Cir.1979); *Independent Oil Workers v. Mobil Oil Corp.*, 441 F.2d 651, 653 (3d Cir.1971).

Moreover, while Penn Central intimates in its discussion of the scope of review that a bankruptcy court may exercise equitable powers to change the terms of the contracts, it is well-settled that an equity court may not refuse to enforce terms of a contract, absent a showing of fraud, accident or mistake. *See Manufacturers' Finance Co. v. McKey*, 294 U.S. 442, 448–49, 55 S.Ct. 444, 447, 79 L.Ed. 982 (1935); *In re Four Seasons Nursing Centers of America, Inc.*, 483 F.2d 599, 603 (10th Cir.1973).

### IV.

Since we cannot affirm on the basis of the district court's interpretation of the contracts, we must consider the alternative grounds urged by Penn Central for upholding the judgment appealed from.

#### (a) Implied in Fact Contract

First, Penn Central argues that, even if the district court improperly rewrote the contracts, the judgment should be affirmed because Penn Central is not liable for the $22.3 million spent on unauthorized program maintenance because there was an implied-in-fact agreement between the parties. The conduct and correspondence of the Trustees and, according to Penn Central, the United States Department of Transportation, the Federal Railroad Administration, the United States Railway Association and Congress constitute an agreement, an implied-in-fact contract, effecting that Penn Central rail operations would continue until conveyance by means of whatever assistance might be required under the Rail Act. *See* Penn Central's Brief at 40, which does not contemplate repayment of any funds provided by the government.

■ An implied-in-fact contract is a true contract arising from mutual agreement and intent to promise, but where the agreement and promise have not been ver-bally expressed. The agreement is inferred from the conduct of the parties. *Baltimore O.R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923); *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C.Cir.1973); 1 S. Williston on Contracts § 3 (3d ed. 1957). The elements necessary to form an implied-in-fact contract are identical to those required for an express agreement. 1 S. Williston on Contracts § 3 (3d ed. 1957).

■ The district court rejected Penn Central's implied-in-fact contract argument. We also reject this argument: First, there is no factual basis for finding such a contract. The only conduct to which Penn Central specifically refers is the government's opposition to Penn Central's proposed self-help measures in 1974 and the government's assurances that additional funding would be authorized. This general reference is unpersuasive in light of other conduct of the Trustees and the government. The Trustees and the government repeatedly disagreed over the limitations and controls to be placed on funding to Penn Central. At the Senate hearings on the 1975 amendments to the Rail Act, the following colloquy took place between Senator Hartke and Deputy Secretary of Transportation Barnum:

Senator Hartke:

\*     \*     \*     \*     \*     \*

Now, ... they [the trustees] probably are going to suggest ... that they be provided with merely an outright grant of money to meet the payroll cost in this cash deficiency without any of the additional restrictions that are suggested in your legislation.

Do you have any good arguments against that?

Mr. Barnum: Yes. I think that would be an unnecessary and unwarranted expenditure of the taxpayer's [sic] money.

Regional Rail Reorganization Act Amendments of 1975: Hearings on S.281 Before the Subcomm. on Surface Transportation of the Senate Committee on Commerce, 94th Cong., 1st Sess. 25 (1975).

The Trustees did, in fact, oppose the Transportation Department's legislative proposal. Penn Central trustee Robert Blanchette proposed the following to Congress:

With this situation confronting us, a simple bill increasing the authorization under section 213 seems most responsive to public need.

*Id.* at 40. Congress, however, rejected Penn Central's position. Senator Hartke, the floor manager of the 1975 legislation, stated in debate:

Now, there are several alternatives.... The other is to follow what the Penn Central wanted, and that was that they wanted us just to provide the cash to continue to operate with no strings attached. We rejected that idea.

The provision we have accepted this time is modification of 213 and 215, which in substance says that there must be accountability....

121 Cong. Rec. 1498 (daily ed. Jan. 28, 1975).

Thus, the parties' conduct prior to the 1975 amendments demonstrates that no implied-in-fact contract committing the government to unlimited amounts of subsidies to Penn Central may be inferred. In addition, if an implied-in-fact contract existed entitling Penn Central to all section 215 funds received regardless of whether those funds were spent in accordance with the section 215 agreements, we must ask why Penn Central and the government would waste their time performing an accounting and auditing at the conclusion of each section 215 program?

■ The second reason we must reject Penn Central's argument that an implied-in-fact contract existed is that no government official had the authority to enter into such a contract. If an official cannot commit the government to an express contract, his acts cannot create an implied-in-fact contract, either. *Sutton v. United States,* 256 U.S. 575, 580, 41 S.Ct. 563, 565, 65 L.Ed. 1099 (1921). Furthermore, that the United States is not bound by a contract entered into by a government official acting beyond the scope of his authority is well-settled law. *Baltimore & O.R.R.,* 261 U.S. at 596–97, 43 S.Ct. at 426.

The only appropriation for operations subsidies was the nearly exhausted $85 million section 213 funding. There could be no authority to commit the government to spend more than was appropriated by Congress ($270 million). *See* 31 U.S.C. §§ 1301(a), (d) (1982); *Greene County Planning Bd. v. Federal Power Comm'n,* 559 F.2d 1227, 1239 (2d Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). We must "observe the conditions defined by Congress for charging the public treasury." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

Penn Central refers generally to the conduct of DOT, the Federal Railroad Administration (FRA), USRA and Congress but fails to identify who committed the government to the purported agreement. Even if some unidentified government official did reach such an agreement with Penn Central, the agreement would be invalid because no government official was authorized to do so and Congress, by enacting sections 213 and 215, repudiated the commitment which Penn Central urges. The crucial term of Penn Central's purported implied-in-fact contract is the promise of unlimited federal assistance. An agent for the government, however, could not have made such an agreement because Congress had not enacted legislation authorizing such an uncapped subsidy. *See Sutton,* 256 U.S. at 580, 41 S.Ct. at 565.

■ Third, no implied-in-fact contract can be found when, as here, the parties have an express agreement dealing with the same subject. *See, e.g., Klebe v. United States,* 263 U.S. 188, 191–92, 44 S.Ct. 58, 58–59, 68 L.Ed. 244 (1923); *ITT Federal Support Services, Inc. v. United States,* 209 Ct.Cl. 157, 531 F.2d 522, 528 (1976); *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 428 F.2d 1241, 1255 (1970). Penn Central contends that the implied-in-fact contract here covers a different subject than that of the express agreements. It argues that the section 215 agreements were a means to provide part of the cash

required to continue its operations, and were not the "whole of the understanding" between Penn Central and the government. According to Penn Central, "[t]he agreements were only a discrete part of the overall understanding between the parties, which was considerably broader in scope and based upon conduct and correspondence both prior and subsequent to the four Section 215 contracts." Penn Central's Brief at 42. This argument is without merit. Not only was there no larger agreement, *see* discussion *supra,* but the alleged implied-in-fact contract covers the same subject as the section 215 agreements. The section 215 agreements provided funds to Penn Central to perform program maintenance on lines, facilities and equipment to be conveyed to Conrail which the government determined needed repair the most. In addition, those funds helped Penn Central continue in operation until the conveyance. Section 213 funds also provided general operating funds to Penn Central. Therefore, we must reject Penn Central's implied-in-fact contract argument.

### (b) Quasi-Contract

■ Penn Central's second alternate argument is that it is not liable for the $22.3 million because there was an implied-in-law contract. Penn Central insists that quasi-contractual relief is appropriate to avoid unjustly enriching the government. According to Penn Central, it did not receive any benefit or gain from the section 215 funds. Rather, because the funds were used to continue rail operations and to maintain properties that were conveyed to Conrail, Penn Central argues, only Conrail and the government benefitted from the section 215 funds. This contention is also without merit. Penn Central certainly benefitted from these funds as well. The fed-

eral funding authorized in section 215 permitted Penn Central to make it through to conveyance. Consequently, Penn Central avoided additional losses which would have occurred if its system had been halted as a result of its cash flow problems. In addition, Penn Central's system was improved in its last year of operation, thereby creating better service and probably avoiding more wrecks and damage claims. Indeed, as the government urges, there is a good argument Penn Central itself would be unjustly enriched if allowed to retain $22.3 million when there was an agreement that those monies would be returned if not spent in accordance with the contract terms.

■ Moreover, a contract implied-in-law may not be found if there is an express contract on the same subject. *See Mediterranean Enterprises, Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir.1983); *Occidental Life Insurance Co. v. Pat Ryan & Assoc., Inc.,* 496 F.2d 1255, 1267 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974). As discussed above, the section 215 agreements were express agreements between Penn Central and the government on the subject of financial assistance to Penn Central. Accordingly, Penn Central's implied-in-law contract argument is rejected.[9]

### (c) Equitable Estoppel

■ Penn Central's last alternate argument is that the government should be equitably estopped from recovering the $22.3 million because it has engaged in "affirmative misconduct." *Community Health Services v. Califano,* 698 F.2d 615, 620–22 (3d Cir.1983), *rev'd on other grounds,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). According to Penn Central, this "affirmative misconduct" consist-

---

**9.** The government also points out that a suit against the United States under the Tucker Act, 28 U.S.C. § 1491, may not be based upon a contract implied-in-law. *See United States v. Minnesota Mutual Investment Co.,* 271 U.S. 212, 217, 46 S.Ct. 501, 503, 70 L.Ed. 911 (1926); *Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). While the United States may sue for damages based on a quasi-contractual claim, *see, e.g., United States v.*

*Dae Rim Fishery Co.,* 794 F.2d 1392, 1394–95 (9th Cir.1986), we know of no cases, nor does Penn Central cite any cases, which hold that a contract implied-in-law may be asserted defensively against the United States. Because we find no basis for quasi-contractual recovery, however, we need not decide whether in an appropriate case such a theory can be asserted as a set-off.

ed of the government allegedly "induc[ing] [Penn Central] to forego self-help measures and instead to rely on the Government to provide sufficient cash to keep [Penn Central] operating." Penn Central's Brief at 47.

The traditional elements of estoppel are as follows:

> If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act ... the first person is not entitled
>
> ....
>
> (b) to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired.

Restatement (Second) of Torts § 894(1) (1979).

Thus, the party claiming estoppel must show that he relied on the other's conduct "in such a manner as to change his position for the worse," 3 J. Pomeroy, *Equity Jurisprudence* § 805 at 192 (S. Symons ed. 1941) and that his reliance was reasonable because he did not know nor should have known that his adversary's conduct was misleading, *see Wilber Nat'l Bank v. United States,* 294 U.S. 120, 124–25, 55 S.Ct. 362, 364, 79 L.Ed. 798 (1935).

The district court rejected Penn Central's estoppel contention, and we find it untenable. There is no record evidence that the government falsely induced the Trustees to take any action or that the government misrepresented its position. The hearings, discussions and negotiations which took place between the parties, as discussed *supra,* belie the veracity of Penn Central's contention. The audit/repayment provisions of the four section 215 agreements were not concealed from Penn Central. Nor is there any basis in the record to believe that Penn Central would not have entered into the agreements if it had realized that the government would recoup

misspent funds. Clearly, Penn Central cannot, with full knowledge of the facts, accept the benefits of the section 215 contracts and then, under the guise of the doctrine of equitable estoppel, attempt to take an inconsistent position to avoid its obligations under those contracts. *See Kaneb Services, Inc. v. Federal Savings & Loan Ins. Corp.,* 650 F.2d 78, 81 (5th Cir. 1981). Thus, we conclude that there are no facts present here which warrant application of equitable estoppel against the United States.

## V.

Because the district court impermissibly rewrote the section 215 contracts in rejecting the government's reimbursement claims, and because alternative arguments advanced in support of that judgment are without merit, we must reverse and remand for further proceedings in the district court or before designated arbitrators as appropriate under the terms of each contract.