## Smith v. Hemphill

C.P. of Chester County, No. 2012-04425

*Barry R. Rothman*, for plaintiffs.
*Lawrence E. Wood*, for defendants.

TUNNELL, *J.*, June 27, 2014—

## FINDINGS OF FACT

1. William Smith, Sr. is a principal of the plaintiff, Evergreen Management Group, Inc. (hereinafter referred to as "Evergreen"), a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.

2. Brian Hemphill is a principal of defendant, Commercial Snow + Ice, LLC (hereinafter referred to as "Commercial"), a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania.

3. By email dated November 22, 2010, Commercial extended an offer to Evergreen to do snow and ice removal, shoveling and salting, as its sub-contractor at

various locations and for specified sums depending on snowfall amounts.

4. Evergreen indicated general interest.

5. On the following day, November 23, 2010, Commercial sent Evergreen an attachment of four or five pages containing additional terms and conditions and requested a signature.

6. Commercial was contracted to a third party, Brickman Facilities Solutions, Inc. (hereinafter referred to as "Brickman"), to provide snow and ice removal at two Acme Supermarket locations in south Philadelphia. Brickman's contract, denominated a service partner sub-contractor agreement, contained, among other things, the same scope of services which in fact Commercial copied and redacted in some fashion and sent to Evergreen.

7. Commercial did not sign the Brickman contract until February 2011. The Brickman contract contained a "no assignment" clause which prohibited Commercial from subcontracting with others.

8. Evergreen was not aware that it was in fact a sub-sub-contractor, was not aware of any relationship between Commercial and Brickman, and was obviously unaware of any prohibition that would have precluded its being hired.

9. There were further emails between Smith and Hemphill, the principals of these two parties, the plaintiff indicating it wished to meet to go over Acme's requirements, and the defendant requesting a signature on the scope of services agreement.

10. Neither happened.

11. Plaintiff proceeded to enter into performance during

the balance of December 2010 through late February 2011.

12. Plaintiff generated 47 invoices for its services, of which 20 were paid and 27 remained outstanding.

13. Plaintiff took care to receive a service ticket with a signature or stamp every time it plowed or performed other services at an Acme location, indicating Acme's satisfaction with the work.

14. At no time did Evergreen proceed to perform any services without first being dispatched by defendant.

15. At some point a third location, Stella Maris Church, was added as a customer.

16. Defendant Commercial asserted three reasons for non-payment: overcharging, double billing and shoddy workmanship.

17. At no time did defendant contemporaneously notify plaintiff of any complaint regarding the work performed.

18. Two personal injury claims arose at locations serviced by the plaintiff.

19. No evidence was introduced to show a causal connection as to plaintiff's services.

20. Smith called Brickman complaining of being unpaid by Commercial, but made no derogatory remarks concerning Commercial.

21. Although Commercial was terminated by Brickman, this had to do with Commercial's violation of the "no assignment" clause in hiring Evergreen, and nothing to do with any lack of quality in the snow plowing at the Acme locations or any disparaging remarks.

22. Commercial made claim for its expenses in cleaning up after Evergreen on several dates, and for administrative time expended because of Evergreen's poor performance.

23. No documentation or testimony was afforded to support these claims.

## DISCUSSION

Evergreen was hired in the early winter of 2010 as a sub-sub-contractor to remove snow and ice by Commercial which, in turn, was a sub-contractor for those purposes to a third party, Brickman. The court has determined that this is purely a dispute between two disclosed commercial entities about the performance of certain plowing and salting services. The plaintiff conceded in closing argument that William Smith, Sr. was not properly a party plaintiff, and the court agrees. He is removed as such. Although there are counterclaims by the defendants, the court has determined that they are not meritorious. Likewise, although the principal of Commercial, Brian Hemphill, was named as an individual party defendant, he has no liability as such to the plaintiff and he should not have been so named. He is dismissed from this action.

This dispute involves the plaintiff's services at three locations in south Philadelphia, two of them being at Acme Markets, referred to at trial as "Johnston" and "Passyunk" by virtue of their locations. The third location was Stella Maris, a church. After Commercial failed to pay 20 of 47 invoices sent to it by Evergreen for services rendered at the foregoing properties on various dates, suit was instituted. The complaint alleged two counts, breach of contract and *quantum meruit* for the value of the services provided. Although the plaintiff has referred to its contract with defendant as implied, the court regards the contract

between them as express.

The distinction between express and implied contracts rests on alternative methods of contract formation. Contracts are "express" when the parties state their terms and "implied" when the parties do not state them. The distinction is based not on the contracts' legal effect, but on the way the parties manifest their mutual assent. *In Re: Penn Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d. Cir. 1987). In other words, the terms "express" and "implied" do not denote different kinds of contracts, but rather reference the evidence by which the parties demonstrate their agreement. *Baer v. Chase*, 392 F. 3d. 609, 616 (3d. Cir. 2004). The plaintiff's suggestion that its agreement is "implied" rather than "express" advances a distinction without a difference as to the mode of contract formation and is immaterial to the disposition of its breach of contract claim. This is because different legal consequences do not flow from analyzing the alleged contract as implied-in-fact rather than express. *Id.* Because the court has determined that there is an express contract, there cannot, however, be an implied contract covering the same subject matter. *In Re: Penn Cent. Transp. Co.*, 831 F. 2d. at 1229-30. Express contract and implied-in-fact contract theories are mutually exclusive. *Baer*, at 617. Consequently, there can be no recovery under a *quantum meruit* theory when the parties' relationship is based upon an express contract for services. *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F. 2d. 989 (999 3d. Cir. 1987).

The crucial terms in this case were in writing. Defendant's email to the plaintiff on Monday, November 22, 2010 (Defs.' ex. 3) is an offer that contains the property locations and the proposed compensation for each. For example, if the snowfall was "0 to 3 inches" at Johnston

Street, the offer was to pay plaintiff $436 to shovel the walkways and plow the lot, and $217 to apply salt to the lot and walkways. The offer contained additional and various compensation schemes depending on the amount of snowfall. To this plaintiff Evergreen indicated general interest. Defendant Commercial followed up by sending four (4) or five (5) pages of certain specifications and conditions on the following day and indicated that plaintiff was to sign this paperwork.

For the next two weeks, according to the emails, there was certain back and forth. Plaintiff indicated that it wanted to meet and go over Acme's needs. That meeting never occurred, nor did the plaintiff sign anything. It was the defendant's intention to have Evergreen become bound to all the terms and conditions that Commercial was in turn required to meet under a proposed written contract it had with Brickman. What Commercial sent by way of email attachment was four (4) or five (5) pages from the Brickman contract concerning "scope summary," apparently redacted at least in part to make it appear to be a contract between it and Evergreen. Testimony revealed that in fact defendant Commercial had not signed the very contract with Brickman that it wanted Evergreen to sign with it. In fact, defendant did not sign the Brickman contract until February 7, 2011, by which time plaintiff had almost concluded its services.

An express contract can be accepted by performance, and plaintiff entered into its performance by plowing, shoveling and salting the two Acme locations, and later the church location as well when it was added by the defendant as a customer. The question for the court was what contract did plaintiff accept? The court determines that there was never a meeting of the minds in respect

to the four (4) or five (5) page attachment containing additional terms, some of which were in conflict with the email offer referred to above. (Defs.' ex. 3). A further problem is that only one page of the redacted contract came into evidence (Defs.' ex. 18), as a consequence of which the court was unable to study or analyze any of the other terms to which the defendant wanted to obligate the plaintiff. For these reasons, the court believes that the only contract, and it was an express one, was that offer contained in defendant's exhibit 3 which was accepted by plaintiff's performance.

The defendant offered three reasons why it refused to pay the outstanding invoices submitted by Evergreen. The first is that the plaintiff did not charge at the contract rate, as set out in the offer. Mr. Hemphill was quite convincingly proven wrong in this assertion during trial and, on the contrary, the charges were mathematically correct. He also claimed that the plaintiff double-billed him on two or three separate occasions. However, in the court's view, Mr. Hemphill was unconvincing in his testimony. On the matter of his billings, he appeared equivocal and appeared to have no real confidence in his own billings for the same dates to his vendor, Brickman. Brickman was a long-time customer, and Hemphill had been in the business many years. It thus surprised the court when Hemphill testified as follows:

> In the case of Brickman, they were sending me checks that I had no idea what they were to, and then I had to try to make sense of it all. So I would have to randomly put together basically a puzzle saying, you know what, I'm going to add these numbers up with something else and just try to make it fit, and that's why I had, you know, all these spreadsheets and a tremendous amount

of correspondence trying to make sense of it all. (N.T., 5/15/14, pp. 12-13).

On another occasion, when asked about certain invoices, Hemphill stated:

A lot of times, like I was saying, these invoices would come in and I would average them, I would take what he wrote, average it out, send it out, right out the door. That's just one way.

I mean, it's just — you know, you got so much going on when you're billing that there's really — I don't have, like, a hard and fast rule of this is how I do it, even though I should. (N.T. 5/15/14, pp. 7-8).

Consequently, the court had no confidence in Mr. Hemphill's paperwork.

Defendant's final reason for not paying some of the invoices was that the plaintiff performed "shoddy work." Here he also lost the credibility battle. Firstly, he raised no specific complaints with the plaintiff contemporaneous with the events in question. Secondly, a witness from the Brickman organization was called who articulated that there were "no major problems" with the snowplowing services at the two Acme locations that winter. Plaintiff was required to and did get signatures from the Acme managers after each plowing or salting, which satisfies the court that there was no real problem of any kind. It is true that on one occasion a Bobcat had to be called in to relocate certain piles of snow. But this in the court's mind did not indicate a shoddy or subpar performance. Other exhibits admitted into evidence indicated that this occasion had been a very significant snowfall and that the problem was a general one at many locations, not just where the plaintiff had worked.

278

For these reasons, the court will award damages to the plaintiff in the amount of the unpaid invoices for which claim has been made, plus interest.

The court now addresses the counterclaims made by defendant Commercial. One concerned tortious interference because certain supposed derogatory comments were made by the plaintiff's principal, Mr. Smith, to Brickman. The testimony by Brickman witnesses indicated, however, that no derogatory remark had anything to do with Commercial's termination by Brickman. In point of fact, the credible evidence is that Commercial was terminated by Brickman for violating the "no assignment" clause in the contract between them, which Commercial did by hiring Evergreen. (N.T., 4/22/14, pp. 74, 96).

Defendant was also aggrieved that his liability insurance was increased, apparently as the result of two slip and falls at locations that plaintiff was servicing for defendant. However, the record is completely devoid of any evidence that plaintiff's services had any causal connection with such premium increase.

Defendant also claimed certain amounts were due it for cleaning up after the plaintiff on several different dates. It further makes claim for administrative time expended due to poor performance by Evergreen. Unfortunately, Mr. Hemphill forgot to bring the documentation with him to trial and, as no testimony was given, these claims must fail. The counterclaims were unproven.

## CONCLUSIONS OF LAW

1. An express contract for services was formed between these parties.

2. Plaintiff did not breach its contract.

3. Defendant's given reasons for refusing to pay the 27 invoices submitted by plaintiff lack merit.

4. Plaintiff is entitled to the unpaid principal amount of $16,045.40, plus interest at the legal rate.

5. Defendant breached the contract by failing to pay the plaintiff in full.

6. Plaintiff's performance had nothing to do with defendant Commercial's termination as a sub-contractor of the Brickman organization.

·7. Plaintiff's performance had nothing to do with either the causation of the slips and falls, or any premium increment arising therefrom.

## ORDER

And now, this 27th day of June, 2014, after a trial by the court sitting without a jury held on April 22, 2014, April 24, 2014 and May 15, 2014, and in accordance with the foregoing decision, it is hereby ordered and decreed that:

1. William Smith, Sr. is dismissed as a party in this case;

2. Brian Hemphill is dismissed as a party in this case;

3. On the complaint, the court finds in favor of plaintiff, Evergreen Management Group, Inc., and against defendant Commercial Snow + Ice, LLC in the principal amount of $16,045.40, with interest to be computed and added at the legal rate;

4. On the counterclaims, the court finds in favor of the plaintiff, Evergreen Management Group, Inc., and against the defendant, Commercial Snow + Ice, LLC, in no amount.